**In re PRUDENTIAL SECURITIES INCORPORATED LIMITED PARTNERSHIPS LITIGATION.**

**Nos. MDL 1005, M–21–67 (MP).**

United States District Court,
S.D. New York.

Dec. 2, 1997.

***OPINION AND DECISION RE FEES AND EXPENSES***

MILTON POLLACK, Senior District Judge.

### INTRODUCTION

By orders dated August 1, 1997 this Court finally approved the terms of the settlement, between plaintiffs and the Polaris Defen-

dants,[1] which is embodied in the Stipulation of Settlement With Polaris Defendants (the "Settlement"), dated April 22, 1997. The Settlement provided, among other things, that the Polaris Defendants would pay $22,500,000 into a settlement fund for the benefit of the PAIF Subclass (the "Class"). The Class was certified by court order dated June 5, 1997.[2] The Preliminary Approval Order scheduled a hearing to finally determine the fairness, reasonableness and adequacy of the Settlement as well as an award of attorneys' fees and reimbursement of expenses to Class Counsel and directed the manner by which notice of the Settlement and Fairness Hearing was to be provided to the Class. After notice to Class members, on August 1, 1997 a Fairness Hearing was held. There were no objections filed with the Court nor did any Class member appear at the Fairness Hearing to object to the Settlement or to counsel's fee application. After hearing and deliberation, the Settlement was approved and reduced to judgment. However, the Court deferred consideration of Class Counsels' joint petition for attorneys' fees and expenses (the "Fee Petition") until closer to the time that the Claims Administrator, the Garden City Group, will be distributing proceeds of the Settlement to Class members.

Class Counsel now report that the Garden City Group expects to be able to distribute funds to Class members in January, 1998. Prior to calculating each Class member's share of the common fund it is necessary to determine the amount that will be withdrawn from the fund to compensate counsel. Thus, the Court now considers the Fee Petition.

In support of the Fee Petition Class Counsel presented the following:

1. Joint Affidavit of Melvyn I. Weiss and Lawrence A. Sucharow in Support of Approval of Polaris Partial Class Action Settlement and Plan of Allocation and in Support of the Joint Petition for an Award of Attorneys' Fees and Litigation Expenses (the "Weiss/Sucharow Affidavit");

2. Compendium to the Weiss/Sucharow Affidavit (the "Compendium");

3. Plaintiffs' Memorandum in Support of Request for Final Approval of Partial Class Action Settlement and Plan of Allocation and in Support of the Joint Petition for an Award of Attorneys' Fees and Litigation Expenses ("Plaintiffs' Memorandum"); and

4. Supplemental Affidavit of Joel H. Bernstein in Support of Request for Final Approval of Partial Class Action Settlement and Plan of Allocation and in Support of the Joint Petition for an Award of Attorneys' Fees and Litigation Expenses ("Supplemental Affidavit").

The Fee Petition requests an award of $6,750,000 in attorneys' fees and $1,038,879.77 in reimbursement of expenses from October 1, 1995 to the present.[3] Class Counsel's efforts have resulted in the establishment of a $22,500,000 common fund for the benefit of the Class. Counsel also request that they be paid accrued interest on such portion of the common fund that will be awarded to them from the date of deposit until the date of payment.

## APPOINTMENT AND ORGANIZATION OF CLASS COUNSEL

On April 14, 1994, the Judicial Panel on Multidistrict Litigation ("JPMDL") entered an order transferring to this Court several

---

1. The "Polaris Defendants" are: Polaris Holding Company, Polaris Aircraft Leasing Corporation, Polaris Investment Management Corporation, Polaris Securities Corporation and Peter G. Pfendler.

2. By order dated June 5, 1996, the Court certified a subclass of all purchasers of limited partnership units of Polaris Aircraft Income Fund I, Polaris Aircraft Income Fund II, Polaris Aircraft Income Fund III, Polaris Aircraft Income Fund IV, Polaris Aircraft Fund No. V and Polaris Aircraft Income Fund VI (collectively, the "PAIF Partnerships" or the "PAIFs") during the period

from January 2, 1985 through January 22, 1991 (the "Class Period"). Certain investors were excluded from the Class.

3. Class Counsel were previously compensated for work performed and expenses paid up to October 1, 1995 pursuing plaintiffs' claims against the defendants by the fee and expenses award granted in the settlement with the Prudential Securities Incorporated ("PSI") Settling Defendants (the "PSI Settlement"). (*See* Order No. 53, *In re Prudential Sec. Inc. Ltd. Partnerships Litig.*, 912 F.Supp. 97 (S.D.N.Y.1996)).

class actions which arose out of PSI's alleged fraudulent marketing and sale of units in hundreds of different limited partnerships, including the six PAIF Partnerships.[4]

On May 19, 1994, this Court entered Order No. 1, later superseded by Order No. 2 on June 27, 1994, which consolidated the Constituent Actions for pre-trial purposes, designated an Executive Committee of Plaintiffs' Counsel and designated Melvyn I. Weiss, Lawrence A. Sucharow and H. Sullivan Bunch of the firms of Milberg Weiss Bershad Hynes & Lerach LLP, Goodkind Labaton Rudoff & Sucharow LLP and Bonnett, Fairbourn, Friedman & Balint P.C. respectively as Liaison Counsel of the Executive Committee. Later, the Executive Committee appointed Messrs. Weiss and Sucharow as Co–Chairmen. Plaintiffs' Executive Committee was authorized to assign tasks to other counsel who had appeared for various plaintiffs in the lawsuits making up the Constituent Actions. As specific needs arose, the Executive Committee formed other subcommittees to deal with the ongoing prosecution of the case and settlement negotiations.

### The Joint Fee Petition

In the Compendium, plaintiffs' counsel have filed affidavits from each of the law firms that are requesting the award of counsel fees. An attachment to each affidavit sets forth the number of attorney and paralegal hours expended on this litigation by each individual at the firm involved, as well as the current non-contingent hourly rates charged by the firm for such services.

### Services Rendered by Plaintiffs' Counsel

Class Counsel collectively have performed nearly 18,100 hours of thus far uncompensated legal work in pursuit of factual investigation, drafting of legal documents, brief writing, document analysis, depositions, trial preparation and settlement negotiation.

The services rendered were coordinated by members of a litigation committee chaired by Joel H. Bernstein of Goodkind Labaton Rudoff & Sucharow LLP so as to avoid duplication and efficiently prosecute the claims. The primary areas of responsibility of the litigation committee members were as follows:

1. Kevin Roddy of Milberg Weiss Bershad Hynes & Lerach LLP was in charge of legal analysis including legal research with respect to issues briefed, analysis of admissibility of evidence, preparation of motions in limine, jury instructions and damage theories.

2. Denise Schwartzman of Chimicles Jacobson & Tikellis was in charge of analyzing Polaris and General Electric ("G.E.") financial statements[5] to determine whether they contained hidden evidence of fraud. This included analysis of the critical "residual values" of the PAIFs' aircraft so that Class Counsel could develop the evidence to show the trier of fact that Polaris treated the aircraft leased by the PAIFs in a manner that was different from what was originally represented to investors.

3. H. Sullivan Bunch of Bonnett, Fairbourn, Friedman & Balint, P.C. was in charge of marshalling evidence concerning what investors were told about these Partnerships from their brokers, how the information provided to investors was different from the truth and investigating and discovering the facts from which Class Counsel could present evidence that the uniform sales pitch that investors were provided with actually came from Polaris as opposed to brokerage firms such as PSI and Kidder Peabody.

4. William Butterfield of Finkelstein Thompson & Loughran was responsible for analyzing Polaris internal operations including determinations of who the lessees of partnership aircraft were, the nature of the

---

4. The "Constituent Actions" transferred include the following cases, *Bottner v. A.G. Spanos Residential Partners—86*, 93 Civ. 7708 (S.D.N.Y.); *Kahn v. Prudential–Bache Properties, Inc.*, 93 Civ. 5976 (S.D.N.Y.); *Dumbroff v. Fogelman*, 93 Civ. 6261 (S.D.N.Y.); *Gorman v. Almahurst, Inc.*, 93 Civ. 8805 (S.D.N.Y.); *Kinnes v. Prudential Sec. Group, Inc.*, 93 Civ. 654 (D.Ariz); *Massad v. Prudential Ins. Co.*, 93 Civ. 5095 (D.N.J.); *Levine*

*v. Prudential–Bache Properties Inc.*, 92 Civ. 52 (N.D.Ill.); *Connelly v. Prudential–Bache Sec.*, Civ. 93–713 TUC ACM (D.Ariz.) and *Howland v. Polaris Holding Co.*, CA No. 4:94–66 TUC ACM (D.Ariz.).

5. The Polaris Defendants were subsidiaries of G.E.

lessees' financial condition, and what the lease provisions were. In addition, Mr. Butterfield was responsible for implementing the document management and document imaging software utilized by Class Counsel and making sure that it ran efficiently so that when counsel needed to find a crucial piece of evidence at a moment's notice they could.

Each member of plaintiffs' Litigation Committee gave various discrete tasks within the areas they were in charge of to other Class Counsel. In this fashion, Class Counsel, a group of several law firms, formed, in effect, a single "special purpose" law firm for the purpose of prosecuting this action.

In preparing this case Class Counsel were required to analyze in detail six prospectuses and supplements, each more than a hundred pages in length. They had to analyze more than 250 10–Ks and 10–Qs filed with the SEC (six partnerships, four reports a year, eleven years). They had to analyze aircraft appraisal reports and purchase and lease agreements for nearly a hundred aircraft purchased by the PAIFs. They had to scour thousands of pieces of correspondence between the Polaris Defendants and investors for evidence buttressing their claims of fraudulent concealment.

Documents in this case were produced separately by the Polaris Defendants, PSI, General Electric, Pettit and Martin (Polaris' corporate attorneys), and by separate auditors for the PAIFs and G.E. A large team of lawyers and paralegals spent months going through these documents, first separating them by type and category and then determining which would be used at depositions and trial. In fact, a crucial "smoking gun", a memorandum from Jack Welch, Chairman of G .E., which was relied on by this Court in denying summary judgment, was found only as a result of meticulous scrutiny of hundreds of thousands of pages of documents produced by the Polaris Defendants and third parties.

In preparing the case for trial Class Counsel deposed 25 individuals. These included Polaris employees, Polaris and G.E. auditors, PSI and Kidder Peabody employees and the aircraft appraisers that the Polaris Defendants had relied on at the time they were purchasing aircraft. The Polaris employees who were deposed had different employment responsibilities. In addition to deposing the company's executives, counsel deposed employees with responsibility in Investor Marketing, Aircraft Marketing, Investor Relations/Communications and Accounting.

With respect to PSI and Kidder Peabody employees Class Counsel deposed individual brokers as well as regional and national sales coordinators and obtained testimony from them which plaintiffs' counsel would have used to show that the brokerage firms were not expert at Polaris' aircraft leasing business. Plaintiffs' counsel would use this evidence to attempt to prove that the brokers obtained information directly from Polaris, and, not realizing that the information was false, passed it on to investors to convince them to invest in the Partnerships.

In deposing Polaris' outside aircraft appraisal consultants Class Counsel obtained evidence indicating that Polaris had been told, at the time the Partnerships were formed, but did not disclose to investors, that aircraft residual values would drop in value precipitously.

Class Counsel consulted with five expert witnesses. David Treitel of Simhat Helliesen & Eichner (aircraft leasing expert), Steven Lillien, Chairman of Accounting at Bernard Baruch College (accounting expert), John Torkelson (damage expert), former SEC Commissioner Richard Roberts (disclosure expert) and William Jordan of Florida State University (limited partnership expert). Class Counsel retained a jury consultant and were preparing for mock trials at the time the case was finally settled.

In addition to the above, Class Counsel submitted excellent written and oral presentations in order to defeat the Polaris Defendants' motion for summary judgment[6] and to

---

**6.** The summary judgment motion raised a number of complex legal issues which Class Counsel successfully defeated including claims that prospectuses issued by the defendants "bespoke cau-

tion" statute of limitations and that retroactive application of the Private Securities Litigation Reform Act of 1995 ("PSLRA") would divest this Court of subject matter jurisdiction because un-

succeed in obtaining certification of the Class.

Additionally, Class Counsel claim to have expended $1,038,879 in actual out of pocket expenses in prosecuting this case including, among other things, approximately $359,000 in expert witness fees, $203,000 for their "high-tech" document database and imaging system, $150,000 in travel expenses (necessitated because depositions took place throughout the United States and because many of the non-New York based attorneys were frequently required to attend Court hearings, meetings and review documents in the New York metropolitan area), $51,000 in court reporting services, $49,000 in LEXIS and Westlaw computerized research charges, and $75,000 in reproduction expenses. Without such efforts and the willingness to risk these substantial expenses it is unlikely in this Court's opinion that the substantial settlement at hand could have been obtained.

Joel H. Bernstein of the Goodkind firm was the attorney charged by the Executive Committee with coordinating all of the efforts and expenditure of funds set forth above in order to ensure that this litigation move forward efficiently in order to obtain the maximum result possible for the Class.

**Lodestar and Percentage Analyses.**

■ The determination of an appropriate fee under the lodestar approach starts with the lodestar, comprised of the amount of hours devoted by counsel multiplied by the normal, non-contingent hourly billing rate of counsel. That calculation produces the lodestar. Because counsel who rendered services were not being compensated for their work as it was being performed and because of the significant risk that they might never receive any compensation if the action was unsuccessful, courts have, when warranted, applied a multiplier to the lodestar to arrive at a fair

contingent fee. The fee being requested by Class Counsel, in comparison to their actual lodestar, represents a multiple of 1.45.

■ In considering the fairness of the fees requested pursuant to a lodestar and multiplier approach, courts look to the factors enunciated by the Second Circuit in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 470 (2d Cir.1974) ("*Grinnell I*").[7] *See also In re Prudential Sec. Inc. Ltd. Partnerships Litig.*, 912 F.Supp. 97, 100 (S.D.N.Y.1996) (Pollack, J.). In considering the fairness of fees the courts serve as fiduciaries, guarding the rights of absent class members. *City of Detroit v. Grinnell Corp.*, 560 F.2d 1093, 1099 (2d Cir.1977) ("*Grinnell II*"); *In re Ivan F. Boesky Sec. Litig.*, 888 F.Supp. 551, 562 (S.D.N.Y.1995) (Pollack, J.).

■ Among the factors considered by *Grinnell I* is whether Class Counsel had the benefit of a prior judgment or decree in a case brought by the government. Plaintiffs here did not have the benefit of such a judgment or decree. In fact the Polaris Defendants had the benefit of prior appellate decisions in *Harner v. Prudential–Bache Sec. Inc.*, No. 92–1353, No. 92–1910, 1994 WL 494871, 1994 U.S.App. Lexis 25266 (6th Cir. Sept. 9, 1994) and *Weisl v. Polaris Holding Co.*, 226 A.D.2d 286, 641 N.Y.S.2d 288 (1st Dep't 1996) and a jury verdict in *Riskind v. Prudential Sec. Inc.*, No. 94–02–12341–CV (Tex. Dist. Ct., Maverick County 1995) on their side. In each of these cases investors sued the same defendants over virtually the same wrongs and lost, primarily on statute of limitations and bespeak caution grounds. Moreover, the only pending governmental proceedings relating to this litigation assisted defendants, not plaintiffs, as the settlement in *Securities and Exch. Comm'n v. Prudential Sec. Inc.*, No. 93–2164 (D.D.C.) served to reduce the Polaris Defendants' exposure to

---

der PSLRA securities fraud is no longer a "predicate act" to a RICO claim. *See In re Prudential Sec. Inc. Ltd. Partnerships Litig.*, 930 F.Supp. 68 (S.D.N.Y.1996).

**7.** These factors include "(1) whether plaintiff's counsel had the benefit of a prior judgment or decree in a case brought by the Government, (2) the standing of counsel receiving the award and opposing counsel, (3) time and labor spent, (4)

magnitude and complexity of the litigation, (5) responsibility undertaken, (6) the amount recovered, (7) the knowledge the court has of conferences, arguments that were presented and of work shown by the record to have been done by attorneys for the plaintiff prior to trial, (8) what it would be reasonable for counsel to charge a victorious plaintiff [and (9)] the attorney's 'risk in litigation'." *Id.*

this Class. Plaintiffs obtained no benefits from any proceedings brought by the government.

A second factor considered in *Grinnell I* is the standing of counsel at the bar—both counsel receiving the award and opposing counsel. At the time of the PSI Settlement, this Court found that it "had the opportunity at first hand to observe the quality of plaintiffs' class counsel's representation both here and in prior complex litigation, and is impressed with the quality of plaintiffs' class counsel as representing a caliber adequately fitted to the difficult tasks faced on this unusual series of actions." *In re Prudential Sec.*, 912 F.Supp. at 101. Since the issuance of that opinion the Court continued to observe the quality of Plaintiffs' counsel and, with respect to their representation of the present Class their representation has been equal to that previously stated. Further, Dennis Block and Joseph Allerhand of Weil Gotschal & Manges, defense counsel for Polaris are both highly regarded counsel who tenaciously litigated against plaintiffs throughout these proceedings.

As described in more detail above, the time and labor spent by counsel has been extensive.

This case involving six limited partnerships and more than $1 billion invested dollars was of large magnitude and complex because of the complex RICO allegations made, the number of party and non-party witnesses, the volume of documents to analyze and the hurdles to be overcome in view of the *Harner, Weisl* and *Riskind* results.

*Grinnell I* requires the Court to assess the responsibility undertaken by counsel. Here the Court observed first hand the continuous responsibility undertaken by Class Counsel in litigating every aspect of this case and Settlement. The magnitude and complexity of the action demonstrate the substantial responsibility undertaken here. Although there were only six PAIFs, about 135,000 people invested over $1 billion in those partnerships, representing approximately 14% of the $7 billion invested in all 700 limited partnerships sponsored by PSI. The responsibility undertaken by Class Counsel was enormous and, as the vigor with

which they litigated demonstrates, was carried out by Class Counsel with an understanding of the importance of their efforts to plaintiffs and the members of the Class.

*Grinnell I* requires consideration of the amount recovered for the Class. The recovery here, of $22.5 million, when considered as an addition to the $110 million already recovered in the PSI settlement, "is a landmark and one of the largest recoveries ever obtained in a class action brought on behalf of investors." *In re Prudential Sec.*, 912 F.Supp. at 101.

*Grinnell I* also requires the Court to analyze the work product of Class Counsel. In the instant action, the Court has presided over numerous conferences, oral arguments and hearings and has had the opportunity to see first hand the caliber of the attorneys representing the plaintiffs and the class and the quality of their work product. The Court has reviewed and analyzed the multi-volume Consolidated Complaint, memoranda of law and other written work product of Class Counsel. Further, in considering motions for summary judgment and class certification the Court had the opportunity to review numerous transcripts of depositions taken by Class Counsel as well as "smoking gun" documents that could only be uncovered by a meticulous search through hundreds of thousands of pages of documents produced by defendants and third parties. The Court also was intimately involved in the settlement negotiations and the efforts of Class Counsel to obtain the best possible settlement on behalf of plaintiffs and the members of the Class. With respect to each item of work the Court observed Class Counsel perform, the Court is of the opinion that the work product was of the highest caliber.

The eighth factor discussed by *Grinnell I* is what would be reasonable for counsel to charge a victorious plaintiff. Attorneys entering contingency fee agreements with their clients typically seek between 33% and 40% of recovery. *In re Prudential Sec.*, 912 F.Supp. at 101. Class Counsel here request a fee equivalent to 30% of the recovery.

The final factor discussed in *Grinnell I* is the risk of litigation. The risk in this action

was extremely high, in part because of how long ago the partnerships at issue were sold. Other elements that added to the risk were the numerous defenses available to the defendants including the "bespeaks caution" doctrine and the possible retroactive application of the PSLRA.[8]

The percentage of the common fund analysis of proposed attorneys' fees has found increased favor with the courts in recent years. *See Swedish Hosp. Corp. v. Shalala,* 1 F.3d 1261, 1269; *Camden I Condominium Ass'n v. Dunkle,* 946 F.2d 768, 774 (11th Cir.1991); *Paul, Johnson, Alston & Hunt v. Graulty,* 886 F.2d 268, 272 (9th Cir.1989). The Supreme Court has noted that in calculating attorney fees under the common fund doctrine, "a reasonable fee is based on a percentage of the fund bestowed on the class." *Blum v. Stenson,* 465 U.S. 886, 900 n. 16, 104 S.Ct. 1541, 1549 n. 16, 79 L.Ed.2d 891 (1984). One reason that the percentage-of-fund approach has gained favor is that it most closely approximates the manner in which attorneys are compensated in the marketplace for contingent cases. *See In Matter of Continental Illinois Sec. Litig.,* 962 F.2d 566, 572 (7th Cir.1992).

The Notice of Pendency of Class Action and Settlement Hearing, mailed to Class Members, advised that Class Counsel would request a fee not to exceed 30% of the Settlement fund. No objection to the amount of the requested attorney fees has been received. In determining the reasonableness of a requested fee, numerous courts have recognized that "the lack of objection from members of the class is one of the most important reasons." *General Public Utils. Sec. Litig.,* [1983–1984 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 99,566 at 97,231 (D.N.J. Nov. 16, 1983); *In re Art Materials Antitrust Litig.,* 1984–1 Trade Cas. (CCH) ¶ 65,-815 at 67,417 (N.D.Ohio Dec. 27, 1983); *Ressler v. Jacobson,* 149 F.R.D. 651, 656 (M.D.Fla.1992).

This Court has previously held in *In re Prudential Sec.,* 912 F.Supp. at 102, that the calculation of the fees to be awarded in an equitable fund case must be made in accordance with the Second Circuit's decision in *City of Detroit v. Grinnell Corporation ("Grinnell I"),* 495 F.2d 448 (2d Cir. 1974) which mandates the use of the lodestar method. However, this Court has found it appropriate to test the reasonableness of fee awards by reference to the percentage-of-recovery method. The Court has also recognized that the lodestar analysis is subject to discretionary upward adjustments and provides a useful guide for determining a fair and reasonable fee in common fund recovery cases. (footnotes omitted).

Under the lodestar approach, the District Court must first quantify the attorney's services in terms of the time they have expended on the case, and then the Court must value those hours. The Court must multiply the hours worked on the case by the hourly amount to which attorneys of like skill in the area would typically be entitled to for a given type of work on the basis of an hourly rate of compensation. The resulting number is the attorneys' "lodestar."

As described above, this was an extremely complicated case and required an enormous effort by numerous attorneys with varied expertise. As reflected in the Compendium, this action was prosecuted by plaintiffs' counsel with an admirable organization, efficiently utilizing less expensive paralegals and junior associates for routine discovery tasks and more senior and experienced attorneys for more crucial functions. The Compendium submitted by Plaintiffs' counsel reports that attorneys and paralegals expended an aggregate of 18,099.45 hours rendering their professional services in these proceedings. Their collective lodestar based on their stated current hourly billing rates is $4,660,-738.50. The Court has made the necessary analysis of the records submitted. This Court is satisfied, based on the submissions

---

8. This Court's denial of summary judgment in favor of the Polaris Defendants (*In re Prudential,* 930 F.Supp. 68) did not end their ability to raise these defenses. Had the case gone to trial they would have been entitled to raise the statute of limitations and bespeak caution defenses in front of a jury. Further, they would have been entitled to argue in favor of the retroactivity of the PSLRA and lack of federal jurisdiction on appeal.

and the Court's direct observations, that the reported hours were appropriately expended for the benefit of the Class and that the hourly rates claimed fairly approximate the hourly rates of compensation attorneys of like skill in this area would charge for similar services.

Calculation of the lodestar is, however, only the beginning of the analysis:

> The Court has broad discretion which should be appropriately exercised to adjust the lodestar to take into account such factors as: (i) the contingent nature of the expected compensation for their services; (ii) the consequent risk of nonpayment viewed as of the time of filing the suit; (iii) the quality of the representation; (iv) the results achieved. In high risk common fund cases such as these, courts normally apply a multiplier to the lodestar to adjust for the foregoing considerations in arriving at the total fee to be awarded. (footnotes omitted).

*In re Prudential Sec.*, 912 F.Supp. at 102. *See also In re Ames Dep't Stores, Inc., Debenture Litig.*, 835 F.Supp. 147, 149 (S.D.N.Y.1993).

Here, Plaintiffs' counsel's lodestar of $4,660,738.50 should be increased for each of these factors.

The contingent nature of the fee and the risk of non-payment requires that there be an upwards adjustment. Since lodestar is, by definition, the amount that counsel would have charged a paying client on a straight hourly basis—win, lose or draw—if the attorney is in fact successful there must be some reward for the attorneys' undertaking the risk of non-payment. The Second Circuit has explicitly recognized the attorneys' "risk of litigation" as an important factor for consideration in making an appropriate fee award:

> No one expects a lawyer whose compensation is contingent upon his success to charge, when successful, as little as he would charge a client who in advance had agreed to pay for his services, regardless of success. Nor, particularly in complicated cases producing large recoveries, is it just to make a fee depend solely on the reasonable amount of time expended.

*Grinnell I*, 495 F.2d at 470 (quoting *Cherner v. Transitron Elec. Corp.*, 221 F.Supp. 55, 61 (D.Mass.1963)). Numerous courts have recognized that the attorney's contingent fee risk is an important factor in determining the fee award. *See In re Warner Communications Sec. Litig.*, 618 F.Supp. 735, 747–749 (S.D.N.Y.1985), *aff'd*, 798 F.2d 35 (1986). In *Florin v. Nationsbank of Georgia, N.A.*, 34 F.3d 560, 565 (7th Cir.1994), the Seventh Circuit held that a risk multiplier in a common fund case is *mandated* if the court finds that counsel had no sure source of compensation for their services. *Id.* at 565. *See also In re Washington Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1302 (9th Cir.1994) ("the district court abused its discretion in denying a risk multiplier" in awarding fees out of a common settlement fund).

While Plaintiffs' counsel have achieved an excellent recovery for the Class, the reader should not assume that, at the commencement of this litigation, any recovery was assured. The risk of litigation at the commencement of this litigation, when Plaintiffs' counsel had to commit their time and resources, was great. The risk of non-payment viewed as of the time of filing the suit supports an upwards adjustment to Plaintiffs' counsel's lodestar.

The results achieved, a $22,500,000 settlement fund, also supports an upward adjustment to the lodestar.

However, it is the Court's duty to avoid any sense of vicarious generosity or to permit the lodestar to be enhanced above a fair and reasonable amount. After mature reflection on Plaintiffs' counsels' petition and records submitted, the Court finds that an upwards adjustment to 1.25 times the reported lodestar is appropriate, and awards a fee of $5,825,923.00. This modest multiplier adequately compensates counsel for their efforts while maintaining as much of the benefit as possible for the Class. Checking this fee award by the percentage basis, the award amounts to approximately 26%, which is lower than most private contingent fee arrangements and is within the range of reasonableness. The fee award shall be in satisfaction of all attorney and paralegal fees of Plain-

tiffs' counsel, both previously rendered as well as such additional administrative services as are to be performed by Plaintiffs' counsel[9] in connection with the administration and distribution of the Net Settlement Fund and generally closing the case with respect to the Polaris Defendants.[10] Twenty-five percent of the fees awarded herein shall be held in reserve pending the distribution of the Net Settlement Fund to the Class.

Further, after reflection, the Court in its discretion will deny counsel's request for any interest reimbursement with respect to said fees, preserving all sums earned as interest for members of the Class.

### Expenses

■ Class Counsel also seek reimbursement of the substantial costs incurred by them in litigating against the Polaris Defendants.

The expenses for which Class Counsel seek reimbursement aggregate $1,038,879.77. Class Counsel claim that these expenses were necessarily incurred in connection with the prosecution of the action and were advanced by Class Counsel to properly represent the plaintiffs and the members of the class.

Not only did Class Counsel take the risk of litigation in this action, they also advanced their own funds and financed the Constituent Actions. As discussed, the magnitude of the action, the volume of documents produced, the sophisticated document management systems, the large number of depositions taken all across the country and the experts retained all required that Class Counsel expend substantial amounts to prosecute the action.

The Court has scrutinized each applicant law firm's detailed request for expense reimbursement. After reflection the Court believes that the amount requested by Class Counsel for reimbursement of their expenses

should be reduced from the requested $1,038,879.77 to $1,000,000. This reduction is made because the Court believes that certain requested expenses such as overtime payments for law firm personnel, meals and other expenses of similar kind are more in the nature of "office overhead" expenses and not properly compensable by members of the Class.

In reviewing counsels' detailed request for expense reimbursement the Court finds the vast majority of those expenses reasonable, necessary and well warranted. Thus, rather than requiring counsel to submit to a detailed and costly audit of their expenses the Court will order those expenses reduced by $38,-879.77, an approximation of the requested reimbursement attributable to "overhead". Thus, reimbursement of expenses will be limited to $1,000,000.

The Court in its discretion denies the request of Counsel for payment of interest earned on any sums to be paid for expense reimbursement.

### Conclusion

Based on the facts discussed above, and the applicable law, this Court approves a fee to Class Counsel of $5,825,923.00. Whether analyzed under the lodestar and multiple approach or under the percentage of the benefit approach, this fee to Class Counsel is both warranted and reasonable. Similarly, counsel are entitled to the reimbursement of $1,000,000 for the out-of-pocket disbursements that they advanced to obtain this benefit on behalf of the plaintiffs and the members of the Class.

For all of the foregoing reasons, the Court awards fees in the amount of $5,825,923.00 to be allocated jointly by Melvyn I. Weiss and Lawrence A. Sucharow among the attorneys who participated in the prosecution of the action.[11] Class Counsel shall also receive, from the settlement fund, reimbursement of

---

**9.** The fees and expenses of the Claims Administrator, The Garden City Group Inc. will be considered separately.

**10.** This does not limit Plaintiffs' counsel's ability to apply for fees and expenses with respect to the settlements with the remaining defendants.

**11.** Each of the law firms participating in the present application has submitted an affidavit consenting to have the amounts awarded herein paid jointly to the Milberg Weiss and Goodkind Labaton law firms and that Melvyn I. Weiss and Lawrence A. Sucharow are authorized to allocate fees among all participating counsel.

the out-of-pocket disbursements incurred by Class Counsel in the amount of $1,000,000, to be allocated by Mr. Weiss and Mr. Sucharow.