### In re SUNBEAM SECURITIES LITIGATION.

No. 98–8258–CIV.

United States District Court, S.D. Florida.

Nov. 29, 2001.

Gerald J. Rodos, M. Richard Komins, Jeffrey A. Barrack, Barrack, Rodos & Bacine, Philadelphia, PA, for CWA/ITU Negotiated Pension Plan, Merrill F. Davidoff, Lawrence Deutsch, Robin B. Switzenbaum, Berger & Montague, Philadelphia, PA, Abraham Rappaport, Milberg, Weiss, Bershad, Hynes & Lerach, Boca Raton, FL, Robert M. Kornreich, Chet B. Waldman, Carl Stine, Wolf Popper, New York City.

Robert E. Zimet, Christopher P. Malloy, Skadden, Arps, Slate, Meagher & Flom, New York City, for Sunbeam Corp.

Eliot Lauer, Curtis, Mallet–Prevost, Colt & Mosle, New York City, for Arthur Anderson.

Donald S. Zakarin, Pryor Cashman, Sherman & Flynn, New york City, for Albert J. Dunlap and Russell A. Kersh.

Thomas J. McGonigle, McGuire Woods, Washington, DC, for Robert J. Gluck.

David J. George, Matthew Triggs, Proskauer Rose, Boca Raton, FL, for David C. Fannin.

Brian Rosner, New York City, for Donald R. Uzzi.

## ORDER APPROVING SETTLEMENT WITH ARTHUR ANDERSEN LLP AND GRANTING ATTORNEYS' FEES

MIDDLEBROOKS, District Judge.

THIS CAUSE comes before the Court upon the proposed settlement with Arthur Andersen LLP and the plaintiffs' counsel's application for an award of attorneys' fees and reimbursement of expenses.[1] The Court has reviewed the extensive record and is advised in the premises. A final settlement fairness hearing was held in West Palm Beach, Florida, on November 27, 2001. Because the Court finds the proposed settlement to be fair, adequate, and reasonable, the settlement shall be approved. Further, the Court grants an award of attorneys' fees in an amount of 25% of the settlement fund.

---

1. The Court shall reserve ruling on the application for reimbursement of expenses pending receipt and review of certain requested documentation.

## I. *Background*

A brief history of this case, taken largely from the parties' recent submissions, is as follows: Sunbeam is engaged in the business of developing, manufacturing, and marketing consumer products such as gas barbecue grills, outdoor casual furniture, warming blankets, vaporizers, and other kitchen and household appliances. Settling defendant Arthur Andersen LLP ("AA"), a firm of certified public accountants with offices located nationwide, served as Sunbeam's independent outside auditor prior to and during the class period (April 23, 1997 through June 30, 1998).

On July 17, 1996, Sunbeam announced the hiring of defendant Albert J. Dunlap as its new Chairman and Chief Executive Officer in a press release describing Dunlap as "well known for his success in turning around companies and improving shareholder value." By the end of July 1996, Dunlap had replaced Sunbeam's top managers with his own management team and announced plans to institute a dramatic and aggressive restructuring of the company.

On April 23, 1997, the first day of the class period, Sunbeam issued a press release announcing its financial results for the first quarter of 1997. Plaintiffs allege that Sunbeam's financial statements for its 1997 second, third, and fourth quarters, 1997 year-end results and the 1998 first-quarter results were materially overstated. As a result of those putative falsely inflated financial statements, as well as other statements made by Sunbeam and its management, the investing public was alleged to have been misled, throughout the class period, into believing that Dunlap and his management team had, indeed, reversed the course of Sunbeam's business and financial decline.

On March 6, 1998, Sunbeam filed with the SEC its report on Form 10–K for the year that ended December 28, 1997 (the "1997 10–K"), which contained AA's report that it had performed an audit of Sunbeam's 1997 financial statements in accordance with the Generally Accepted Auditing Standards ("GAAS") as well as its unqualified opinion that Sunbeam's 1997 financial statements fairly presented, in all material aspects, the financial position of Sunbeam in accordance with the Generally Accepted Accounting Principles ("GAAP").

Information about Sunbeam's true financial condition first began to reach the market on March 19, 1998, when Sunbeam issued a press release which warned that it might not meet analysts' estimates for the first quarter of 1998. Two weeks later, in an April 3, 1998 conference call, Sunbeam revealed that first-quarter 1998 sales were 5% below reported sales for the first quarter of 1997 and that its Chief Operating Officer, defendant Donald R. Uzzi, had been terminated. Throughout May and early June of 1998, further revelations of business reversals and various accounting issues were reported, among other places, in Sunbeam's May 11, 1998 first-quarter 1998 earnings announcement (released after two postponements) and its Form 10–Q for the first quarter of 1998 (filed May 15, 1998), as well as in the magazines *Forbes, Fortune,* and *Barrons.* On June 15, 1998, Sunbeam issued a press release announcing the board's removal of Dunlap as Chairman and Chief Executive Officer. The Board also fired defendant Russell Kersh, Dunlap's lieutenant, on June 17, 1998.

On June 25, 1998, further revelations of previously concealed information accompanied Sunbeam's announcement confirming that the SEC was investigating the company's accounting practices for possible violations of the securities laws.

On June 30, 1998, the last day of the class period, Sunbeam announced that the Audit Committee of its Board of Directors

would conduct a review into the accuracy of its 1997 financial statements, that "pending the completion of its review, its 1997 financial statements and the report of Arthur Andersen LLP should not be relied upon," and that the review "could result in a restatement of the 1997 financial statements and the first quarter 1998 Form 10–Q." In November 1998, Sunbeam filed with the SEC revised financial statements for fiscal years 1996, 1997, and the first quarter of 1998.

The restated 1997 financial statements reported net sales for 1997 that were approximately $95 million lower than originally reported, earning from continuing operations that were approximately $71 million lower than previously reported, and net earnings that were approximately $70 million lower than previously reported. By the end of the class period, Sunbeam's common-stock price had dropped to $10 ⅞₆ per share, down from a high of $53.00 per share.

The initial complaint in this action was filed in April of 1998. In June 1998, the Court consolidated the initial case with a number of subsequently filed cases and, in December of 1998, appointed lead plaintiffs and co-lead counsel. On January 6, 1999, plaintiffs filed a Consolidated Amended Class Action Complaint. After numerous motions to dismiss were filed and fully briefed, the Court denied most of the motions and granted several with leave to amend. Plaintiffs then filed a Second Consolidated Amended Class Action Complaint (the "Complaint"). The Complaint alleges that plaintiffs and other class members purchased the common stock of Sunbeam during the class period at artificially inflat-

ed prices that were the result of the defendants' dissemination of false and misleading statements regarding Sunbeam. The Complaint alleges that these statements were made in violation of Section 10(b) of the Securities Exchange Act of 1934, Rule 10b–5 promulgated thereunder, and, against the individual defendants only, of Section 20(A) of the '34 Act. Plaintiffs contend that AA issued its report on Sunbeam's financial statements for the years ended 1996 and 1997 while knowingly and recklessly disregarding that the statements were not presented in accordance with GAAP; that the AA audits were not performed in accordance with GAAS; and that the AA's audit opinion reports were made in violation of Section 10(b) and Rule 10b–5.

The settlement between the plaintiffs and AA provides for the distribution of $110 million, plus accrued interest and less all taxes, approved attorneys' fees, costs and expenses, to all class members who have submitted a Proof of Claim. The settlement provides for the distribution of such funds according to a Plan of Allocation[2] that accounts for the differences in individual class members' losses over the class period.

After preliminary approval of the settlement with AA was entered by this Court, notice was provided to class members. Potential class members were notified of the terms of the settlement through a program of mailing individual notice, whereby notice was mailed to more than 121,000 potential class members; and through a summary notice published in the July 30, 2001 national edition of the *Wall Street*

---

**2.** The Court finds the Plan of Allocation, described on pages 37–41 of the Joint Declaration of Plaintiffs' Co–Lead Counsel in Support of: (A) The Proposed Settlement With Arthur Andersen LLP; and (B) Plaintiffs' Counsel's Application for an Award of Attorneys' Fees and Reimbursement of Expenses, filed No-

vember 16, 2001, to be fair, adequate and reasonable. This well-constructed Plan is based upon an analysis of the level of price inflation of Sunbeam stock and an evaluation of Sunbeam's various disclosures concerning its financial status. The Plan will equitably distribute the settlement fund.

*Journal.* The notices described the terms of the proposed settlement, apprised the class members of their rights with respect to the settlement, and informed them of this Court's schedule for consideration of the settlement. The Court has only received letters from two individual shareholders, both of whose main objections to the settlement terms focus on the 30% of the settlement amount sought as attorneys' fees.

II. *Legal Standard for Settlement Approval*

 In the class-action context, any proposed class settlement and award of attorneys' fees requires court approval. *See Piambino v. Bailey,* 757 F.2d 1112, 1139–42 (11th Cir.1985). In making this determination, a district court is vested with broad discretion, and his or her decision is reviewed for an abuse of discretion. *See generally In re Chicken Antitrust Litig. Am. Poultry,* 669 F.2d 228, 238 (5th Cir.1982). "In determining whether to approve a proposed settlement, the cardinal rule is that the District Court must find that the settlement is fair, adequate and reasonable and is not the product of collusion between the parties." *Cotton v. Hinton,* 559 F.2d 1326, 1330 (5th Cir.1977).[3] In making this determination, this Court "should always review the proposed settlement in light of the strong judicial policy that favors settlements." *Behrens v. Wometco Enters., Inc.,* 118 F.R.D. 534, 538 (S.D.Fla.1988), *aff'd,* 899 F.2d 21 (11th Cir. 1990); *see also In re U.S. Oil & Gas Litig.,* 967 F.2d 489, 493 (11th Cir.1992) (noting that "public policy strongly favors the pretrial settlement of class action lawsuits."). Then–Chief Judge King has stated the following concerning the judicial favoritism shown toward the settlement of large and complex cases, such as this one:

> This policy has special importance in class actions with their notable uncertainty, difficulties of proof, and length. Settlements of complex cases contribute greatly to the efficient utilization of scarce judicial resources and achieve the speedy resolution of justice, for a just result is often no more than an arbitrary point between competing notions of reasonableness.

*Behrens,* 118 F.R.D. at 538 (internal citations and quotations omitted). The Eleventh Circuit has stated that, in evaluating whether a proposed settlement is "fair, adequate and reasonable," the district court should look to the following six factors: (1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which a settlement is fair, adequate, and reasonable; (4) the complexity, expense, and duration of the litigation; (5) the substance and amount of opposition to the settlement; and (6) the stage of proceedings at which the settlement was achieved. *See Bennett v. Behring Corp.,* 737 F.2d 982, 986 (11th Cir.1984). However, "[i]n evaluating these considerations, the district court should not try the case on the merits" nor "make a proponent of a proposed settlement justify each term of a settlement against the hypothetical or speculative measure of what concessions might have been gained." *Cotton,* 559 F.2d at 1330 (internal quotation and citation omitted). In considering whether a proposed settlement meets the applicable standard, "the trial court is entitled to rely upon the judgment of experienced counsel for the parties." *Id.*

---

**3.** The Court finds no evidence or even allegations of collusion on the part of counsel in this case.

### i. *Likelihood of Success at Trial*

 In order to establish their Rule 10b–5 securities fraud claim at trial, plaintiffs would have to show the following: (1) a misstatement or omission; (2) of material fact; (3) made with scienter; (4) justifiable reliance by the plaintiffs; and (5) that the misstatement or omission was the proximate cause of their injury. *See, e.g., Robbins v. Koger Props., Inc.,* 116 F.3d 1441, 1447 (11th Cir.1997). Plaintiffs claim that at trial, they would have attempted to make out these elements by showing that AA was required to increase the scope of its audit of Sunbeam's 1997 financial statements because there was a significant risk of misstatement due to fraud. In their Memorandum in Support of the Proposed Settlement with Arthur Andersen LLP, plaintiffs claim that they would argue at trial that this was a "high risk" engagement for AA under the AICPA Statement of Auditing Standards No. 82, for reasons including that many of the individual defendants were primarily compensated by stock options or bonuses directly tied to the reported earnings per share of Sunbeam; that Sunbeam's internal audit staff consisted of only two people who reported not to the Audit Committee, as would be appropriate, but to individual defendant Russell Kersh; that there was a "[h]igh turnover of senior management, counsel, or board members"; and that there were several "[s]ignificant, unusual, or highly complex transactions, especially those close to year end," such as Sunbeam's "Early Buy" and "Bill and Hold" programs in 1997.

 However, AA claims that it would have defended against these allegations by contending that their audit of Sunbeam was completely reasonable. AA contends that at trial they would establish that they frequently conferred with and were reassured by top Sunbeam management vis-à-vis the accounting and sales practices in question. Also, AA claims that they could establish that there were significant instances where the financial manipulations were concealed from them, making plaintiffs' showing of scienter very difficult. The Court here notes, in connection with the scienter requirement, that the standard is a fairly high one, requiring at least "severe recklessness," much more than negligence. *See, e.g., Bryant v. Avado Brands, Inc.,* 187 F.3d 1271, 1282 (11th Cir.1999). Success at trial was far less than a sure thing, making the settlement agreement all the more attractive to the plaintiffs.

Many of the plaintiffs' allegations focus on the alleged accounting improprieties concerning Sunbeam's "bill and hold" sales, of which plaintiffs claim AA was or should have been aware. In these sales, it is alleged that Sunbeam violated GAAP by recognizing sales revenue before it was appropriate to have done so, Plaintiffs also allege that Sunbeam violated GAAP by overstating 1997 revenue by $36 million when Sunbeam recognized revenue on guaranteed sales (sales of products for which the buyers had an unlimited right of return) and on consignment arrangements (placement of products with distributors without a transfer of title). In the papers submitted in support of the settlement, AA claims and plaintiffs acknowledge that the evidence produced during discovery permitted AA to raise significant questions about whether it was aware of these improper means by which Sunbeam recognized this revenue. AA claims that the evidence at trial would show that they "asked the right questions" concerning these transactions, but that Sunbeam provided them with false information and at times false documentation.

 Further, the issue of causation is a significant hurdle for the plaintiffs had they gone to trial. In a securities fraud

action, "[t]o prove the causation element, a plaintiff must prove both 'transaction causation' and 'loss causation,'" *Robbins,* 116 F.3d at 1447, the former being "akin to actual or 'but for' causation" and the latter requiring a plaintiff to show "that the untruth was in some reasonably direct, or proximate, way responsible for his loss." *Id.* (internal quotations omitted). The parties here acknowledge that at trial they would "strongly contest" the extent to which external factors affected the value of Sunbeam common stock at various times during the class period.

In light of the difficulty plaintiffs in this type of securities action have faced in meeting the above-described elements, especially when considered in the context of an action against outside auditors rather than a corporation and its officers and directors, there is a substantial question as to the likelihood of complete success at trial. Therefore, this factor weighs in favor of approving the proposed settlement.

ii. and iii. *Range of Possible Recovery and the Point on That Range That the Settlement is Fair, Adequate and Reasonable*

 As was noted in *Behrens,* "[t]he second and third considerations of the *Bennett* test are easily combined." 118 F.R.D. at 541. The Court must first determine the appropriate standard of damages (in order to calculate the range of recovery), and then go on to determine where in this range of recovery a fair, adequate and reasonable settlement amount is found. *See id.* at 541–42. In this securities fraud action, the appropriate measure of damages is the class members' out-of-pocket losses, meaning the dif-

ference between the "true value" of the stock (the value absent the allegedly false and misleading statement(s)) and the actual price paid or received. *See, e.g., The Ambassador Hotel Co., Ltd. v. Wei–Chuan Investment,* 189 F.3d 1017, 1030 (9th Cir. 1999). Plaintiffs' damages experts calculated that there were approximately 318.8 million shares of Sunbeam common stock traded during the class period, of which 49.3 million may have been damages as a result of the alleged wrongdoing. Of the 266.55 million "in and out" shares (those bought and then sold during the class period), 62.6 million were purchased before a corrective disclosure and sold after a partial disclosure. Based on these calculations, the damages experts believe that the highest estimate of the class members' aggregate damages for the common stock are approximately $1.031 billion. This is plaintiffs' "best case" scenario. Plaintiffs also claim candidly that a jury would be unlikely to find AA more than 20% responsible for the total loss.[4] Therefore, the proposed settlement amount represents approximately 53% of what might have been received had plaintiffs won at trial against AA. The parties state and the Court acknowledges that AA's damages expert would have vigorously disputed the economic model plaintiffs used in determining the amount by which Sunbeam common stock was allegedly artificially inflated, as well as the total damages figure.

 In determining where in the range of possible recovery a fair and adequate amount would lie, "the court realizes two important maxims: (1) proof of damages in a securities fraud case is always difficult and requires expert testimony,

---

**4.** Under the PSLRA, AA would only be jointly and severally liable for the total damages if the jury specifically determined that AA "knowingly committed a violation of the securities laws." 15 U.S.C. § 78u–4(f)(2)(A).

Otherwise, AA would only be held responsible for the portion of the damages that corresponds to their percentage of liability, as determined by the jury. *See id.* § 78u–4(f)(2)(B)(i).

and (2) the fact that a proposed settlement amounts to only a fraction of the potential recovery does not mean the settlement is unfair or inadequate." *Behrens*, 118 F.R.D. at 542 (internal citations omitted). Given these considerations, and the fact that this settlement gives the class members the immediate and concrete opportunity to share in a large pecuniary sum, the proposed settlement amount of $110 million appears to fall well within the range of what is fair, adequate, and reasonable.

### iv. *Complexity, Expense, and Duration of the Litigation*

This complex securities fraud case has already taken more than three years to work its way to this point. The plaintiffs here assert that the settlement of their claims with AA will significantly reduce the trial time consumed by this case, saving strained judicial resources. *See Cotton*, 559 F.2d at 1331 ("In these days of increasing congestion within the federal court system, settlements contribute greatly to the efficient utilization of our scarce judicial resources."). Specifically, the parties claim that this settlement will reduce the trial time required in this case by three weeks. Further, the parties claim that further litigation would consume a large amount of financial resources. Given the status of AA as a well-known and well-respected accounting firm, making it highly unlikely that AA would put up little fight at trial, as well as plaintiffs' lead counsel's experience in litigating class-action securities cases, there appears to be merit to this contention. This factor therefore weighs in favor of approving the proposed settlement.

### v. *Substance and Amount of Opposition to the Settlement*

As noted, the Court has only two letters from individuals objecting to the proposed settlement, one from Ms. Ruth Cherico and one from Mr. Horace T. Whitman.

Importantly, these two objections focus solely on the amount of attorneys' fees sought by plaintiffs' counsel, and not on the substance of the settlement itself. This fact militates strongly in favor of the Court finding that the proposed settlement should be approved.

### vi. *Stage of the Proceedings at Which the Settlement Was Achieved*

Trial in this case is set for the two-week trial calendar beginning January 14, 2002. After lengthy settlement negotiations, on April 27, 2001, the parties entered into a Memorandum of Understanding outlining the salient points of the proposed settlement. The Stipulation and Agreement of Settlement With Defendant Arthur Andersen LLP was completed on May 4, 2001. Obviously, the case had progressed to a point where each side was well aware of the other side's position and the merits thereof. This factor weighs in favor of the Court finding the proposed settlement to be fair, adequate, and reasonable. *See Behrens*, 118 F.R.D. at 544.

### III. *The Fees Issue*

■ Three of the four lead plaintiffs in this case seek 30% of the $110 million settlement fund as attorneys' fees, plus expenses. The fourth, plaintiff CWA/ITU Negotiated Pension Plan ("CWA") requests that a maximum of 25% of the settlement amount be awarded as attorneys' fees. The Court's charge is to assess the reasonableness of the requested fee, protecting the interests of the absent class members. *See In re Prudential Secs. Inc. Ltd. P'ship Litig.*, 985 F.Supp. 410, 414 (S.D.N.Y.1997) ("In considering the fairness of fees the courts serve as fiduciaries, guarding the rights of absent class members."). As a player who has been privy to all the ongoings in this action, the Court is

in a prime position to evaluate the reasonableness of the requested fee amount.

■■■■■ The Supreme Court has noted that "[a] litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980);[5] *see also Camden I Condominium Ass'n, Inc. v. Dunkle*, 946 F.2d 768, 771 (11th Cir.1991) ("Attorneys in a class action in which a common fund is created are entitled to compensation for their services from the common fund, but the amount is subject to court approval."). *Camden I* is the preeminent case in this circuit dealing with the issue of attorneys' fees in common-fund class-action cases. In that case, the Eleventh Circuit held that "the percentage of the fund approach [as opposed to the lodestar approach] is the better reasoned in a common fund case. Henceforth in this circuit, attorneys' fees awarded from a common fund shall be based upon a reasonable percentage of the fund established for the benefit of the class." 946 F.2d at 774.

■■■■■ "There is no hard and fast rule mandating a certain percentage of a common fund which may be awarded as a fee because the amount of any fee must be determined upon the facts of each case." *Id.* As a blanket statement, "[t]he majority of common fund fee awards fall between 20% to 30% of the fund," although "an upper limit of 50% of the fund may be stated as a general rule." *Id.* at 774–75. Significantly, the Eleventh Circuit has found that "district courts are beginning to

view the median of this 20% to 30% range, *i.e.,* 25%, as a 'bench mark' percentage fee award which may be adjusted in accordance with the individual circumstances of each case ...." *Id.* at 775. The Court begins by noting that a "benchmark" is just that; it is not a ceiling, but neither is it a floor. Caselaw has clarified the factors to which a district court is to look in determining a reasonable percentage to award class-action counsel. These factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions involved; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the 'undesirability' of the case; (11) the nature and the length of the professional relationship with the client; (12) awards in similar cases. *See id.* at 772 n. 3 (citing factors from *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir.1974)). "Other pertinent factors are the time required to reach a settlement, whether there are any substantial objections by class members or other parties to the settlement terms or the fees requested by counsel, any nonmonetary benefits conferred upon the class by the settlement, and the economics involved in prosecuting a class action." *Id.* at 775. As a final note, the Eleventh Circuit "encouraged the lower courts to consider additional factors unique to the particular

---

**5.** In *Boeing,* the Supreme Court settled the question of from what amount the fees should be calculated: from the total fund or only that actually paid out. The Court "rul[ed] that class counsel are entitled to a reasonable fee based on the funds potentially available to be claimed, regardless of the amount actually

claimed." *Waters v. International Precious Metals Corp.,* 190 F.3d 1291, 1297 (11th Cir. 1999), *quoting* Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 14.03 (3d ed.1992). Therefore, the lead attorneys here are entitled to a percentage of the total $110 million fund.

case." *Walco Investments, Inc. v. Thenen,* 975 F.Supp. 1468, 1472 (S.D.Fla.1997).

After a thorough evaluation of the factors to which the Court is specifically directed to look, as well as those factors unique to this particular case, the Court finds most appropriate an award of 25% of the total settlement fund.

■ *Time and Labor Required:* The plaintiffs and AA entered in settlement negotiations for the first time in October of 1999, and "[a]fter a lengthy hiatus," resumed talks in October 2000 and settled in late April 2001. Lead plaintiffs' counsel have submitted time records showing that in total, more than 80,500 hours on the prosecution of this case and have engaged in 89 depositions of fact witnesses. However, when asked at the final fairness hearing whether this number of hours represented those spent on the settlement with AA or on the case as a whole, counsel conceded that the hours total was that for the case as a whole. While far from denigrating the time and effort all counsel surely spent in reaching this settlement, the Court finds that the *total* hours spent on this case cannot be supposed to be identical to those spent on the settlement with this particular defendant. Therefore, this factor does not weigh nearly as heavily as plaintiffs' counsel urges in favor of an upward adjustment to the established benchmark.

*Novelty and Difficulty of the Questions Involved:* Especially given the fact that this settlement involves claims against the outside auditor as opposed to company insiders, both the novelty and difficulty seem to support a slight upward adjustment. "Plaintiff[s] faced all the multi-faceted and complex legal questions endemic to § 10(b) litigation, including proving *scienter,* materiality, causation, and damages." *Ressler v. Jacobson,* 149 F.R.D. 651, 654 (M.D.Fla.1992).

*The Skill Requisite to Perform the Legal Service Properly and the Experience, Reputation, and Ability of the Attorneys:* Lead plaintiffs' counsel are all associated with law firms well known in the legal community, especially in the area of class-action securities cases. For example, Judge Nimmons of the Middle District of Florida has stated that "Barrack, Rodos & Bacine is recognized nationally to be a leading and skillful practitioner in the field of complex class actions ...." *Id.* The other attorneys are associated with similarly well-known and well-respected firms. Additionally, in assessing the quality of representation, courts have also looked to the quality of the opposition the plaintiffs' attorneys faced. *See id.* Here, AA was represented by the respected firm of Curtis Mallet–Prevost Colt & Mosle LLP. The Court recognizes that counsel for all parties involved comported themselves in a highly professional manner, but finds that this skill and professionalism is well rewarded by a 25% fee award.

*The Preclusion of Other Employment:* Given the relatively large size of the majority of the law firms involved in this action, this factor does not seem to support any adjustment of the 25% benchmark.

*The Customary Fee:* Plaintiffs' counsel cite numerous publications concerning class actions, finding that "[m]edian rates ranged from 27% to 30%" and that "[r]egardless of case size, fees average approximately 32 percent of the settlement." They also cite a string of Southern and Middle District of Florida cases awarding fees of 30% or more. However, one question is whether the size of the settlement here indicates that the Court should be more hesitant to depart upward from the 25% benchmark. Judge Moreno addressed this question in *Walco Investments, Inc.,* where the settlement amount was more than $141 million, but the attor-

neys total request was only for 16.67% of the fund. The objectors sought a lower percentage for the attorneys. Judge Moreno concluded that "[w]hile the application of the sliding scale approach may be warranted in most mega-fund cases," 975 F.Supp. at 1471, it was not appropriate in that case because it involved a settlement with multiple defendants presenting separate issues of law and fact and different theories of recovery. Here, the settlement is with only one defendant, and obviously does not involve separate legal theories and factual scenarios as in *Walco*. However, there are a number of cases that have awarded similar percentages on comparable settlement amounts. *See, e.g., In re Ikon Office Solutions, Inc. Secs. Litig.*, 194 F.R.D. 166, 195–97 (E.D.Pa.2000) (discussing sliding scale approach, declining to apply it, and awarding fees of 33% on $111 million settlement); *In re Combustion, Inc.*, 968 F.Supp. 1116 (W.D.La.1997) (awarding fees of 36% on settlement amount of more than $127 million). After reviewing the caselaw and the circumstances here, the Court finds that the size of the settlement does not warrant a departure either downward or upward from the benchmark. This percentage is well within the range of fees awarded in comparable class-action cases.

*Whether the Fee Is Fixed or Contingent:* "A contingency fee arrangement often justifies an increase in the award of attorneys' fees." *Behrens,* 118 F.R.D. at 548. Further,

> In a securities fraud action, a contingency fee arrangement has added significance. The federal securities laws are remedial in nature and, in order to effectuate their statutory purpose of protecting investors and consumers, private lawsuits should be encouraged. If the ultimate effectiveness of these remedies is to be preserved, the efficacy of class actions, and of contingency fee arrangements-often the only means of legal representation available given the incredible expense associated with these actions must be promoted.

*Id.* (citations omitted). However, the main thrust behind the idea of a contingency fee arrangement justifying an upward departure from the 25% benchmark is that the outcome is unsure in the beginning, and the attorneys assume a fairly great risk of ultimately getting nothing. Here, the allegedly wrongful actions of Dunlap and his associates were fairly apparent by the time this suit was filed and AA's imprimatur was clearly on the relevant financial statements. The Court finds that although plaintiffs' counsel did assume a risk in taking on this case, that risk is adequately compensated for by an award of the benchmark 25% fee, and no adjustment is warranted.

*Time Limitations Imposed by the Client or Other Circumstances:* This factor does not persuade the Court one way or the other in its present consideration.

*The Amount Involved, the Results Obtained and Awards in Similar Cases:* The proposed settlement fund is $110 million, which has earned more than $2 million in interest since May 4, 2001, when is was put into an escrow account. Plaintiffs' counsel represent in their papers and at the fairness hearing that this amount is the second largest settlement ever obtained from an accounting firm. The Court agrees that the amount obtained is impressive. However, although the Court recognizes that "[fee][a]wards of 30% or more of a settlement fund are not uncommon in § 10(b) common fund cases such as this," *Ressler,* 149 F.R.D. at 655–56 (citing a string of cases), "not uncommon" is not tantamount to "always awarded." This Court is in the best position to evaluate the reasonableness of the fee and its effect on the incentive of class-action counsel to take on cases such as the one at bar.

Based on an evaluation of the totality of the factors, a 25% fee award fairly and adequately compensates plaintiffs' counsel here.

*The 'Undesirability' of the Case:* A court's consideration of this factor recognizes that counsel should be rewarded for taking on a case from which other law firms shrunk. Such aversion could be due to any number of things, including social opprobrium surrounding the parties, thorny factual circumstances, or the possible financial outcome of a case. All of this and more is enveloped by the term "undesirable." At the November 27, 2001 hearing, plaintiffs' counsel candidly admitted that this was not an "undesirable" case. On the contrary, given such circumstances as the media attention surrounding this case since before its inception, it was seen as somewhat *attractive* to numerous law firms. The Court finds that the "desirability" of this case cautions against an upward adjustment and firmly supports a decision to stick to the recommended benchmark.

*Professional Relationship With the Clients:* There is no evidence that these attorneys have any prior relationship with any of the plaintiffs. Therefore, this factor does not support any adjustment to the benchmark.

*Other Factors:* Here, one argument cutting against awarding more than 25% of the fund as attorneys' fees is that the SEC has been involved in the situation, first in bringing its investigation and then in bringing a civil penalties action currently pending against the individual defendants. This is in stark contrast to *Ressler,* where plaintiffs' counsel "litigated the action and obtained th[e] excellent settlement without the benefit of any active assistance from any governmental agency," which the court found to be "a significant factor" supporting the 30% fee request. 149 F.R.D. at 654, *citing In re Warner Comm'ns Secs. Litig.,* 618 F.Supp. 735, 748 (S.D.N.Y.1985), *aff'd,* 798 F.2d 35 (2d Cir. 1986); *Bullock v. Administrator of Estate of Kircher,* 84 F.R.D. 1, 16 (D.N.J.1979). At the final settlement fairness hearing, plaintiffs' counsel argued that the SEC's investigation had not significantly assisted these plaintiffs in their cause. Although the SEC may not have affirmatively sought any recovery for these private plaintiffs, the Court finds that the investigatory material, as well as the scrutiny such an investigation brings to bear on the actions of all parties involved, was at least somewhat helpful to this class-action cause. Therefore, this consideration as well cautions the Court to adhere to the 25% benchmark.

Additionally, some courts use the lodestar method as a cross-check of the percentage of the fund approach. *See, e.g., Ressler,* 149 F.R.D. at 653 n. 4. The Court is mindful of the fact that this cross-check is not to be used as a backdoor avenue of using the lodestar method instead of the percentage of the fund method. Here, plaintiffs' counsel claim that their lodestar calculations yield a total of $23,383,676.65. The requested 30% fee of $33 million represents 1.45 times this lodestar amount. Plaintiffs press the fact that "[s]uch an award is extremely reasonable, as courts in common fund cases regularly award multiples of 2 to 3 times lodestar in attorney's fees to reflect the quality of the work performed and the risks undertaken." *Id.* (citing cases). However, the Court concludes that this multiplier is in actuality higher than alleged by plaintiffs' counsel due to the fact that the 80,500–plus hours used by counsel in its lodestar calculation relates to the litigation *as a whole,* not only to the current settlement with AA. Accordingly, the fee petitioners' argument for the appropriateness of a 30% award is not well-grounded in this area.

## IV. *The Fees Objection*

CWA/ITU Negotiated Pension Plan, one of four institutional investor-plaintiffs here, objects to the 30% request and asserts that the proper fee award is 25% of the fund, plus interest. CWA is a multi-employer pension plan, managing approximately $1 billion in assets as of July 1998. CWA bought 17,000 shares of Sunbeam during the class period on behalf of its members. In its objection, CWA claims that Congress's intent behind the PSLRA was to have institutions such as CWA control securities class actions because such investors have a large stake in the outcome. *See, e.g., In re Network Assocs., Inc. Secs. Litig.,* 76 F.Supp.2d 1017, 1020 (N.D.Cal.1999) (stating that in enacting the PSLRA, "Congress expected that the lead plaintiff would normally be an institutional investor with a large stake in the outcome. The lead plaintiff would then monitor, manage and control the litigation, making, as is the case in ordinary cases, litigation decisions on resource allocation and settlement with, of course, the advice of, but not the prerogative of, class counsel."). CWA claims that it has a "paramount" interest in protecting the interests of the class. CWA claims that the 25% benchmark should not be exceeded in large part because there were no unusual or unanticipated risks associated with this case and, in any event, 25% (which would be $27.5 million, plus interest) adequately compensates all attorneys involved. The Court has considered CWA's position in its analysis.

Based upon an analysis of all the circumstances of this case, the Court finds the 25% benchmark fee award to be most appropriate. Although plaintiffs' counsel expended a considerable amount of time and effort in negotiating this settlement, and assumed some risk in taking on the case to begin with, an award of 25% of the common fund, plus interest, fairly and adequately compensates all attorneys involved. Such an award also protects the interests of the absent class members. Circumstances exist warranting an upward adjustment, and circumstances exist suggesting a downward adjustment; these considerations all come out in the wash.

## V. *Conclusion*

For the foregoing reasons, and based upon a thorough review of the record and the caselaw, the Court finds that the settlement is accurately described as "fair, adequate, and reasonable" and therefore should be approved. However, after a careful balancing of the many factors to be scrutinized in determining an appropriate fee award percentage, the Court finds no reason to depart upward or downward from this circuit's 25% benchmark. Accordingly, it is hereby

ORDERED AND ADJUDGED that the Proposed Settlement with Arthur Andersen LLP and the Plan of Allocation are APPROVED. The parties May 3, 2001 Stipulation and Agreement of Settlement With Defendant Arthur Andersen LLP (DE# 629) is herein incorporated by reference. A Final Judgment setting forth the terms of the approved settlement shall be entered by separate Order.

FURTHER, plaintiffs' counsel are hereby AWARDED the sum of $27,500,000 in fees, plus interest at the same rate earned by the $110 million settlement fund, which amount shall be paid to plaintiffs' lead counsel from the settlement fund. The award of attorneys' fees shall be allocated among plaintiffs' counsel in a manner which fairly compensates plaintiffs' counsel for their respective contributions in the prosecution of this action.