Leroy JENKINS, individually and on behalf of all persons similarly situated, Plaintiff

v.

TRUSTMARK NATIONAL BANK, Defendant.

Civil Action No. 3:12–CV–00380–DPJ–FKB.

United States District Court, S.D. Mississippi, Northern Division.

Signed March 25, 2014.

David Malcolm McMullan, Jr., Barrett Law Group, PA, Don John W. Barrett, Don Barrett, PA, Lexington, MS, Stephen J. Fearon–PHV, Jr., Squitieri & Fearon, LLP, New York, NY, for Plaintiff.

Brian C. Smith, Paul H. Stephenson, III, Stephanie M. Rippee, William F. Ray, Watkins & Eager, PLLC, Jackson, MS, for Defendant.

### ORDER OF FINAL APPROVAL OF SETTLEMENT, AUTHORIZING SERVICE AWARDS, AND GRANTING APPLICATION FOR ATTORNEYS' FEES AND EXPENSES

DANIEL P. JORDAN III, District Judge.

On January 28, 2014, Plaintiff Leroy Jenkins and Class Counsel filed their Motion for Final Approval of Class Settlement, Application for Service Awards, and Application for Attorneys' Fees and Expenses ("Motion"), seeking Final Approval of the Settlement Agreement and Release ("Settlement" or "Agreement") with Trustmark National Bank ("Trustmark" or the "Bank").[1] *See* Dkt.

---

1. Plaintiff Jenkins and Class Counsel are joined in the Motion by the named plaintiffs in the related putative class action pending against Trustmark in the Western District of Tennessee. *White, et al. v. Trustmark National Bank,* Civil Action No. 2:12–cv–2485–JTF–cgc (W.D.Tenn.)

Nos. 41–42. In support, Plaintiffs filed declarations from Class Counsel, from an expert in class-action law and attorneys' fees, as well as from others supplementing the factual record to enable the Court to evaluate the fairness and adequacy of this Settlement. *See* Dkt. Nos. 43–46.

This matter came before the Court on March 25, 2014, for a Final Approval Hearing pursuant to the Court's Preliminary Approval Order dated October 11, 2013, and the Order Granting Joint Motion to Reschedule Final Approval Hearing and Preceding Deadlines dated November 14, 2013. *See* Dkt. Nos. 36, 38. The Court reviewed all of the filings related to the Settlement, heard from three class members who spoke in favor of the settlement, and heard from counsel for both parties.

After carefully considering the parties' presentations, the Court concludes that this Settlement provides a fair, reasonable, and adequate recovery for Settlement Class Members, which Class Counsel believes represents approximately forty-six and a half percent (46.5%) of the most probable amount of recoverable damages based on the creation of a $4,000,000 common fund. The Settlement constitutes a satisfactory result for the Settlement Class under the circumstances and challenges presented by the Action.[2] The Court specifically finds that the Settlement is fair, reasonable, and adequate, and a satisfactory compromise of the Settlement Class Members' claims. The Settlement fully complies with Fed.R.Civ.P. 23(e) and, thus, the Court grants Final Approval to the Settlement, certifies the Settlement Class, and awards the fees and costs requested by Class Counsel as well as the requested Service Awards for the representative Plaintiffs.

### BACKGROUND

■ The present evidentiary record is more than adequate for the Court to consider the fairness, reasonableness, and adequacy of the Settlement. A fundamental question is whether the district judge has sufficient facts

before him to evaluate and intelligently and knowledgeably approve or disapprove the settlement. *In re General Tire & Rubber Co. Sec. Litig.,* 726 F.2d 1075, 1084 n. 6 (6th Cir.1984) (citing *Detroit v. Grinnell,* 495 F.2d 448, 463–68 (2d Cir.1974)). In this case, the Court clearly has such facts before it in considering the Motion, including the evidence and opinions of Class Counsel and their experts.

### A. Factual and Procedural Background

Plaintiff Jenkins brought this Action seeking monetary damages, restitution, and declaratory relief, challenging Trustmark's Debit Sequencing Overdraft Practices. Complaint (Dkt. No. 1). Plaintiff alleged that as a result of Trustmark manipulating its customers' Debit Card Transactions, account balances were depleted more rapidly than they should have been, and thus Plaintiffs and members of the Settlement Class paid or were assessed more Overdraft Fees than they should have been. Joint Declaration of Stephen J. Fearon, Jr. and E. Adam Webb ("Joint Decl.") ¶ 5. The Plaintiffs in the Tennessee Action made similar claims. *Id.* at ¶¶ 5, 8–9.

Trustmark denied Plaintiffs' substantive allegations and denied any wrongdoing. *Id.* ¶¶ 6, 74–76. The Bank consistently defended its conduct by highlighting language in the relevant Account agreements that, according to Trustmark, expressly advised customers of, and permitted, the Debit Sequencing Overdraft Practices at issue. *Id.* Trustmark also advanced other defenses, including that Mississippi law precluded Plaintiffs' claims and that federal banking laws preempted almost all of Plaintiffs' claims. *Id.* at ¶¶ 6, 74–76.

On December 2, 2011, Plaintiff Kathy White filed her complaint in the United States District Court for the Northern District of Mississippi alleging that Trustmark improperly assessed and collected overdraft fees ("*White I*"). Agreement ¶ 1. On Febru-

---

("Tennessee Action"). The plaintiffs in the Tennessee Action also are parties to the Settlement, which will resolve *all* Plaintiffs' and Settlement Class Members' claims against Trustmark.

2. The "Action" as defined in the Agreement collectively means this Action and the Tennessee Action.

ary 6, 2012, *White I* was transferred to this Court, where it was assigned Civil Action File No. 3:12–cv–00082–TSL–MTP. Agreement ¶ 2.

On April 27, 2012, the plaintiff in *White I* voluntarily dismissed her case without prejudice and three days later re-filed her case in Tennessee state court ("*White II*"). Agreement, ¶¶ 3–4. On June 21, 2012, Trustmark removed *White II* to the United States District Court for the Western District of Tennessee and one week later answered the complaint by denying any wrongdoing and liability and asserting various affirmative defenses. Agreement ¶¶ 6–7.

On June 4, 2012, while *White II* was pending in Tennessee state court, Plaintiff Leroy Jenkins filed this Action alleging that Trustmark improperly assessed and collected overdraft fees and violated the Electronic Funds Transfer Act ("EFTA"), the Racketeer Influenced and Corrupt Organizations Act ("RICO"), as well as the Bank's customer agreements. Agreement ¶ 5. On July 10, 2012, Trustmark answered *Jenkins*, denying the allegations and asserting various affirmative defenses. *Id.* at ¶ 8.

With *White II* in Tennessee and the *Jenkins* case in Mississippi, Trustmark defended the claims in two federal courts and attempted to transfer *White II* to this Court. *Id.* at ¶¶ 9–19. Plaintiff Kathy White sought leave to add additional former Trustmark customers as named Plaintiffs and Class Representatives (i.e., J.C. Bush, Regina Bush, LaTonya Earls, David Proctor, and Shannon Proctor). *Id.* at ¶¶ 9, 11. Trustmark filed a motion for summary judgment as to Plaintiff Kathy White. *Id.* at ¶ 10.

In January 2013, Trustmark produced several thousand pages of documents that would allow Plaintiffs to better understand the claims and defenses in the Action. Joint Decl. ¶ 13.

In February and March 2013, Plaintiffs in the Tennessee Action continued to litigate their claims, argued the pending motions before Judge John T. Fowlkes of the Western District of Tennessee, and brought additional motions, including a motion to compel discovery and force Trustmark to comply with the local e-discovery procedures. *Id.* at ¶ 14. At the same time, Class Counsel reviewed and analyzed the discovery they had obtained. Joint Decl. ¶¶ 42–43.

In early 2013, Class Counsel worked with their financial experts to formulate an efficient method for obtaining the data from Trustmark in order to properly analyze Trustmark's processing practices and the damages that Plaintiffs and the Class sought in these actions. *Id.* at ¶ 15. Counsel for both sides discussed the scope of the available data and agreed upon an initial subset of the data that Trustmark and its experts would produce to enable the parties to discuss whether it was possible to resolve the case. *Id.* Trustmark then provided Plaintiffs with sample customer transactional data and aggregate information regarding its Overdraft Fee Revenue on Debit Card Transactions. *Id.* Plaintiffs' experts then analyzed this data and had a series of follow-up discussions and data exchanges with Trustmark's attorneys and experts. *Id.*

Those discussions and information exchanges continued throughout April and May 2013, during which time Plaintiff Jenkins moved for class certification in this Action. Agreement ¶ 18. Trustmark also moved to dismiss Plaintiff Jenkins' state law claims. *Id.* at ¶ 19.

At the request of counsel, Magistrate Judge F. Keith Ball agreed to schedule two full-day settlement conferences in June 2013 to help the parties try to settle the case. Joint Decl. ¶ 18. On June 4, 2013, Judge Ball spent all day mediating the cases. *Id.* at ¶ 19. At the end of the first all-day session, the parties were not able to resolve their differences but on June 11, 2013, the parties participated in a second settlement conference. *Id.* By the end of the day, under Judge Ball's supervision, the parties agreed on the material terms of a proposed settlement and agreed to cooperate on setting forth those terms in a Memorandum of Understanding ("MOU"). *Id.*

The parties finalized the terms of the MOU on June 25, 2013. *Id.* at ¶ 20. They then negotiated and prepared the Agreement in August 2013. *Id.*

On August 20, 2013, Plaintiffs and Class Counsel filed their motion for preliminary approval. *See* Dkt. Nos. 31–33. An amended motion for preliminary approval was filed on September 23, 2013. *See* Dkt. No. 34. On October 2, 2013, Trustmark served a notice in compliance with 28 U.S.C. § 1715 upon (a) the Director of Litigation for the Office of the Comptroller of the Currency ("OCC") and (b) the OCC office with supervisory authority over Trustmark, which provided all then-available information required by 28 U.S.C. § 1715(b). On October 11, 2013, this Court entered an Order granting preliminary approval to the Settlement, certifying the Settlement Class, and scheduling a final approval hearing for February 11, 2014. *See* Dkt. No. 36.

Beginning in October 2013, Trustmark advanced $50,000.00 of costs incurred by the Settlement Class to the vendor who performed settlement allocation analyses. The parties have stipulated that the $50,000.00 is a cost that was incurred for the benefit of Plaintiffs and the Class, that Plaintiffs agreed that such costs should be reimbursed from the common fund, and that such amount should be paid from the Settlement Fund to Trustmark by the Settlement Administrator or Escrow Agent. *See* Stipulation (Dkt. No. 51).

On November 14, 2013, the parties filed a joint motion seeking to reschedule the final approval hearing in order to give the Settlement Administrator additional time to comply with the deadlines set forth in the Court's October 11, 2013 Order. *See* Dkt. No. 37. Later that day, the Court granted the joint motion and rescheduled the final approval hearing for March 25, 2014. *See* Dkt. No. 38.

On December 18, 2013, Trustmark served a supplemental notice upon (a) the Director of Litigation for the OCC and (b) the OCC office with supervisory authority over Trustmark which provided additional information related to 28 U.S.C. § 1715(b) disclosures that was not available when the original notice was made.

On January 28, 2014, Plaintiffs and Class Counsel filed their Motion and supporting evidence. *See* Dkt. Nos. 41–46; *also* Dkt. Nos. 48–49.

On January 31, 2014, Ms. Bobbi Primer filed a request to appear at the Final Approval Hearing to discuss what appears to be an unrelated complaint she has with Trustmark. *See* Dkt. No. 47. Because Ms. Primer's request does not object to any aspect of the Settlement and does not contain the information which this Court previously ordered must accompany objections (Preliminary Approval Order, ¶ 28), the Court does not construe it as an objection to the Settlement. Indeed, no objections to the Settlement have been filed.

## B. *Summary of the Settlement Terms*

The Settlement's terms are detailed in the Agreement (Dkt. 33–1). The Court now provides a summary of the material terms:

### 1. The Settlement Class

The Settlement Class is an opt-out class under Rule 23(b)(3) of the Federal Rule of Civil Procedure. The Settlement Class is defined as:

> All holders of a Trustmark Account who, from September 28, 2005 through and including October 11, 2013, incurred one or more Overdraft or NSF Fees as a result of Trustmark's Debit Sequencing Overdraft Practices. Excluded from the Class are all current Trustmark employees, officers, and directors, and the judges presiding over the Action.

Agreement ¶ 69; *also* Oct. 11, 2013 Order (Dkt. No. 36).

### 2. Monetary Relief for the Benefit of the Class

Under the Settlement, Trustmark timely deposited $4,000,000 into an Escrow Account following this Court's Preliminary Approval. Joint Decl. ¶ 22; Agreement ¶ 71. That deposit created the Settlement Fund, which will be used to pay: (i) all distributions of money to the Settlement Class; (ii) all attorneys' fees, costs and expenses of Class Counsel; (iii) all Service Awards to the Plaintiffs; (iv) any residual distributions (Agreement ¶ 113); (v) any taxes; (vi) any costs of Settlement Administration other than those to be paid by Trustmark; and (vii) additional fees,

costs, and expenses not specifically enumerated in the Agreement, subject to approval of Class Counsel and Trustmark. Agreement ¶ 96. In addition to the $4,000,000 Settlement Fund, Trustmark is responsible for paying all fees, costs, charges and expenses incurred by the Settlement Administrator and Notice Administrator. *Id.* at ¶ 73.

All identifiable Settlement Class Members who experienced a Positive Differential Overdraft Fee (and who do not opt-out) will receive a *pro rata* distribution of the Net Settlement Fund. Agreement ¶¶ 98, 100. The Positive Differential Overdraft Fee analysis determines, among other things, which Trustmark Account holders were assessed Additional Overdraft Fees that would not have been assessed if the Bank had (1) not reduced available account balances by the amounts of approved debit card transactions that had not yet posted to the accounts or (2) used a posting sequence or method for Debit Card Transactions other than ordering them from highest-to-lowest dollar amount, and how much in Additional Overdraft Fees those Account holders paid. Agreement ¶¶ 37, 69, 98, 100. The calculation involves a complex multi-step process described in detail in the Agreement. *Id.* at ¶ 98; *also* Joint Decl. ¶ 23. It also provides a mechanism to allocate the Net Settlement Fund in a way that accounts for the differences in the applicable statutes of limitations in the states in which Trustmark does business (referred to as "Distribution Fund A" and "Distribution Fund B"). Agreement ¶¶ 100–108.[3]

Settlement Class Members do not have to submit claim forms or take any other affirmative steps to receive relief under the Settlement. Joint Decl. ¶ 25. Instead, experts will determine each Class member's *pro rata* distribution by analyzing Trustmark's data. Agreement ¶ 98. Within 150 days after the Effective Date, Trustmark and the Settlement Administrator will distribute the Net Settlement Fund to all Settlement Class Members entitled to a distribution. Agreement ¶ 100.

Payments to Settlement Class Members who are Current Account Holders will be made if feasible by the Bank crediting their Accounts, and notifying them of the credits. Agreement ¶ 109. Trustmark will then be entitled to a reimbursement for such credits from the Settlement Fund. *Id.* at ¶ 110. Former Account Holders and Current Account Holders whose Accounts cannot feasibly be automatically credited will receive payments from the Settlement Fund by checks mailed by the Settlement Administrator. *Id.* at ¶ 111. Any uncashed or returned checks will remain in the Settlement Fund for one year from the date the first distribution check is mailed, during which time the Settlement Administrator will make reasonable efforts to effectuate delivery of the Settlement Fund payments. *Id.* at ¶ 112.

The Agreement also provides a mechanism for distributing any funds remaining in the Settlement Fund more than one year after the date the Settlement Administrator mails the first Settlement Fund Payments. *Id.* at ¶ 113. As set forth in the Agreement, the funds initially are distributed on a *pro rata* basis to participating Settlement Class Members who received Settlement Fund Payments if it is economically feasible to do so in light of the costs of administering those subsequent distributions. *Id.* at ¶ 113(a). If it is not economically feasible to distribute those funds *pro rata*, the Agreement provides that the parties will jointly file a proposed plan with the Court for distributing the funds in a way that is consistent with well-regarded guidance on those types of supplemental distributions. *Id.* The Court has the discretion to approve the plan or disregard it as it deems fit. *Id.*

---

3. The Net Settlement Fund—which will be distributed *pro rata* among identifiable Settlement Class Members who do not opt-out of the Settlement—is equal to the Settlement Fund plus accrued interest earned (if any), less the amount of (i) Court-awarded attorneys' fees, costs, and expenses to Class Counsel; (ii) the amount of the Court-awarded Service Awards to the Class Representatives; (iii) a reservation of a reasonable amount of funds for prospective costs of settlement administration (if any) that are not Trustmark's responsibility; and (iv) other costs and/or expenses incurred in connection with the Settlement not specifically enumerated in subsections (a)-(c) of paragraph 101 that are expressly provided for in the Agreement or that have been approved by Class Counsel and counsel for Trustmark. Agreement ¶ 101.

### 3. Additional Relief

In addition to the settlement payments that Trustmark will make, the Bank also agreed that it will continue its current method of time order posting non-recurring Point–of–Sale and ATM debit transactions for two years after the Effective Date. *Id.* at ¶ 72. Trustmark also will pay all fees, costs, charges, and expenses incurred by the Settlement Administrator and Notice Administrator in connection with the Notice Program. *Id.* at ¶ 73.

### 4. Class Release

In exchange for the benefits conferred by the Settlement, all members of the Settlement Class shall automatically be deemed to have fully and irrevocably released and forever discharged Trustmark from claims relating to the subject matter of the Action as fully described and defined in Section XV of the Agreement.

### *DISCUSSION*

■ The federal courts have long recognized a strong policy and presumption in favor of class settlements. The Rule 23(e) analysis should be "informed by the strong judicial policy favoring settlements as well as the realization that compromise is the essence of settlement." *In re Chicken Antitrust Litig. Am. Poultry,* 669 F.2d 228, 238 (5th Cir.1982). In evaluating a proposed class settlement, the Court "will not substitute its business judgment for that of the parties; 'the only question ... is whether the settlement, taken as a whole, is so unfair on its face as to preclude judicial approval.'" *McNary v. Am. Sav. and Loan Ass'n,* 76 F.R.D. 644, 649 (D.C.Tex.1977) (quoting *Zerkle v. Cleveland–Cliffs Iron Co.,* 52 F.R.D. 151, 159 (S.D.N.Y.1971)). Indeed, "[s]ettlement agreements are highly favored in the law and will be upheld whenever possible because they are a means of amicably resolving doubts and uncertainties and preventing lawsuits." *In re Nissan Motor Corp. Antitrust Litig.,* 552 F.2d 1088, 1105 (5th Cir. 1977). Class settlements minimize the litigation expenses of the parties and reduce the strain that litigation imposes upon already scarce judicial resources. Therefore, "in class action suits, there is an overriding public interest in favor of settlement." *Cotton v. Hinton,* 559 F.2d 1326, 1331 (5th Cir.1977) (citing *Van Bronkhorst v. Safeco Corp.,* 529 F.2d 943, 950 (9th Cir.1976)).

As explained below, the Settlement here is more than sufficient under Rule 23(e). It includes a Settlement Fund of $4,000,000, plus an estimated $239,000 that Trustmark has paid or will pay for the fees and costs associated with the Notice Program and Settlement administration. Agreement ¶ 73. Settlement Class Members will receive their recovery as a matter of course, without needing to take any action, based on an analysis by experts of information in Trustmark's possession. *Id.* at ¶¶ 98, 100.

### 1. The Court's Exercise of Jurisdiction Is Proper

In addition to having personal jurisdiction over Plaintiffs, the Court also has personal jurisdiction over all members of the Settlement Class because they received the requisite notice and due process. *See Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 811–12, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985) (citing *Mullane v. Cent. Hanover Bank & Trust Co.,* 339 U.S. 306, 314–15, 70 S.Ct. 652, 94 L.Ed. 865 (1950)); *see also In re Prudential Ins. Co. Am. Sales Practice Litig.,* 148 F.3d 283, 306 (3d Cir.1998), *cert. denied,* 525 U.S. 1114, 119 S.Ct. 890, 142 L.Ed.2d 789 (1999).

### a. The Best Notice Practicable Was Provided to the Settlement Class

■ The Notice Program was comprised of three parts: (1) a direct mail postcard notice ("Mailed Notice") to all identifiable members of the Settlement Class; (2) a publication notice ("Published Notice") designed to reach those members of the Settlement Class for whom direct mail notice is not possible; (3) and a "Long Form" notice with more detail than the direct mail or publication notices, that is available on the Settlement website (*www.TrustmarkBankOverdraftSettlement.com*). Agreement, ¶ 83; Declaration of Staci Nesbit ¶¶ 4–13 ("Nesbit Decl.") (Dkt. No. 44). Each facet of this

Program was properly and timely accomplished. Nesbit Decl. ¶¶ 4–13. The Settlement Administrator received the data files that identified the names and last known addresses of all identifiable Settlement Class Members, ran the addresses through the National Change of Address Database, and mailed postcards to 141,237 Settlement Class Members that contained the Mailed Notice. *Id.* at ¶¶ 7–13. The Mailed Notice Program was timely completed and is estimated to have reached 97% of the identifiable Settlement Class. *Id.* at ¶ 12. The Published Notice Program was completed through advertisements in six newspaper publications covering the major markets in which Trustmark operates. *Id.* at ¶ 6. The Settlement Website with a "Long Form" notice and a toll-free telephone number were established to enable Settlement Class Members to obtain detailed information about the Action and the Settlement. *Id.* at ¶¶ 4–5.

### b. The Notice Was Reasonably Calculated to Inform Settlement Class Members of Their Rights

■ The Court-approved Notice [4] satisfied due process requirements because it described "the substantive claims ... [and] contain[ed] information reasonably necessary to make a decision to remain a class member and be bound by the final judgment." *In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d at 1104–05. The Notice, among other things, defined the Settlement Class, described the release provided to Trustmark under the Settlement as well as the amount and proposed distribution of the Settlement proceeds, and informed Settlement Class Members of their right to opt-out and object, the procedures for doing so, and the time and place of the Final Approval Hearing. It also notified Settlement Class Members that a class judgment would bind them unless they opted out, and told them where they could get more information—for example, at the website that posts a copy of the Agreement, as well as other important court documents. Further, the Notice described Class Counsel's intention to seek attorneys' fees of up to

one-third (33.33%) of the $4,000,000 Settlement Fund.

The Court finds that the Settlement Class Members were provided with the best practicable notice; the notice was "reasonably calculated, under [the] circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Shutts*, 472 U.S. at 812, 105 S.Ct. 2965 (quoting *Mullane*, 339 U.S. at 314–15, 70 S.Ct. 652). This Settlement with Trustmark was widely publicized, and any Settlement Class Member who wished to express comments or objections had ample opportunity and means to do so. Nesbit Decl. ¶ 4–13.

### 2. The Settlement Is Fair, Adequate, and Reasonable, and Therefore Is Finally Approved Under Rule 23

■ In deciding whether to approve the Settlement, the Court analyzes whether it is "fair, adequate, and reasonable and is not the product of collusion between the parties." *Newby v. Enron Corp.*, 394 F.3d 296, 301 (5th Cir.2004) (quoting *Cotton*, 559 F.2d at 1330; *see also In re Chicken Antitrust Litig.*, 669 F.2d at 238. A settlement is fair, reasonable, and adequate when "the interests of the Plaintiff Settlement Class, as a whole, will be better served if the claims against these Defendants are resolved by the Settlement rather than pursued." *In re Granada P'ship Secs. Litig.*, 803 F.Supp. 1236, 1244 (S.D.Tex.1992); *see also In re Ford Motor Co. Bronco II Prods. Liab. Litig.*, 1995 WL 222177, at *3 (E.D.La.1995).

■ The Fifth Circuit has identified six (6) factors to be considered in analyzing the fairness, reasonableness, and adequacy of a class settlement under Rule 23(e):

(1) the existence of fraud or collusion behind the settlement;

(2) the complexity, expense, and likely duration of the litigation;

(3) the stage of the proceedings and the amount of discovery completed;

(4) the probability of the plaintiffs' success on the merits;

---

**4.** *See* Preliminary Approval Order, ¶ 11.

(5) the range of possible recovery; and

(6) the opinions of the class counsel, class representatives, and absent class members.

*Union Asset Mgmt. Holding A.G. v. Dell, Inc.,* 669 F.3d 632, 639 n. 11 (5th Cir.2012) (quoting *Reed v. Gen. Motors Corp.,* 703 F.2d 170, 172 (5th Cir.1983)); *see also In re Katrina Canal Breaches Litig.,* 628 F.3d 185, 194–95 (5th Cir.2010).

### a. There Was No Fraud or Collusion

The Court readily concludes there was no fraud or collusion behind this Settlement. *See, e.g., Batchelder v. Kerr–McGee Corp.,* 246 F.Supp.2d 525, 527 (N.D.Miss.2003) ("The court was intimately involved in the long-running and frequently contentious settlement negotiations between the parties in this action and has no reason to believe that fraud or collusion played a role in the negotiations"); *In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on April 20, 2010,* 910 F.Supp.2d 891, 931 (E.D.La.2012) (stating that "any suggestion of fraud or collusion" respecting a class action settlement was "baseless" since "the Settlement was reached only after many months of hard-fought negotiations"); *Jones v. Gusman,* 296 F.R.D. 416, 467 (E.D.La.2013) (citing the "protracted period of litigation between" the parties as evidence that class a settlement was "not tainted by fraud or collusion"); *Billitteri v. Secs. Am., Inc.,* 2011 WL 3586217, *10 (N.D.Tex. Aug. 4, 2011) ("[T]here is no evidence that the settlement was obtained by fraud or collusion. On the contrary, this settlement was diligently negotiated after a long and hard-fought process that culminated in ultimately successful mediation . . . .") (citing *Quintanilla v. A & R Demolition Inc.,* 2008 WL 9410399, *4 (S.D.Tex. May 7, 2008)).

### b. The Settlement Will Avert Years of Highly Complex and Expensive Litigation

■ This Action involves approximately 141,237 Settlement Class Members (via 148,844 accounts) and wrongful Overdraft Fees in the millions of dollars. Joint Decl. ¶ 40. The claims 14 and defenses are complex; litigating them is both difficult and time-consuming. *Id.* Although this Action was actively litigated for over two years, recovery by any means other than settlement would require additional years of litigation. *Reed,* 703 F.2d at 172 ("The very purpose of [a class action] compromise is to avoid the delay and expense of . . . trial") (quoting *Young v. Katz,* 447 F.2d 431, 433 (5th Cir.1971)) (punctuation omitted); *Mock v. Grady–White Boats, Inc.,* 2013 WL 1879683, *3 (E.D.La. Apr. 17, 2013) (citing "the expense and anticipated time required for trial preparation and the trial itself" as justification for finding a "proposed [class] settlement . . . fair and reasonable").

■ The Settlement provides immediate and tangible benefits to nearly 150,000 Settlement Class Members, all of whom are current or former Trustmark customers. Joint Decl. ¶ 40. As stated in *In re Shell Oil Refinery:*

> The Court should consider the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation. In this respect, "[i]t has been held proper to take the bird in the hand instead of a prospective flock in the bush." *Id.* at 560 (alterations in original) (quoting *Oppenlander v. Standard Oil Co.,* 64 F.R.D. 597, 624 (D.Colo.1974)); *see also In re U.S. Oil & Gas Litig.,* 967 F.2d 489, 493 (11th Cir.1992) (noting that complex litigation "can occupy a court's docket for years on end, depleting the resources of the parties and taxpayers while rendering meaningful relief increasingly elusive"). Particularly because the "demand for time on the existing judicial system must be evaluated in determining the reasonableness of the settlement," *Ressler v. Jacobson,* 822 F.Supp. 1551, 1554 (M.D.Fla.1992) (citation omitted), there can be no doubt about the adequacy of the present Settlement.

155 F.R.D. 552 (E.D.La.1993).

### c. The Factual Record Is Sufficiently Developed to Enable Class Counsel to Make a Reasoned Judgment

■ The Court considers "the degree of case development that class counsel have

accomplished prior to settlement" to ensure that "counsel had an adequate appreciation of the merits of the case before negotiating." *Moore v. Halliburton Co.,* 2004 WL 2092019, *7 (N.D.Tex. Sept. 9, 2004) (citing *In re Cendant Corp. Litig.,* 264 F.3d 201, 235 (3rd Cir.2001)). At the same time, "[t]he law is clear that early settlements are to be encouraged, and accordingly, only some reasonable amount of discovery should be required to make these determinations." *Ressler,* 822 F.Supp. at 1555. Indeed, "[a] settlement may be approved even where plaintiffs have not conducted formal discovery where plaintiffs ... have access to 'the desired quantum of information necessary to achieve a settlement.'" *In re Lease Oil Antitrust Litig. (No. II),* 186 F.R.D. 403, 432 (S.D.Tex.1999) (quoting *In re Corrugated Container Antitrust Litig.,* 643 F.2d 195, 211 (5th Cir.1981)).

■ Prior to settling, Class Counsel developed ample information and performed analyses from which "to assess their position[ ] in great detail and make a reasonable decision on settlement, which is all that is required." *In re Oil Spill by Oil Rig Deepwater Horizon,* 295 F.R.D. 112, 149 (E.D.La. 2013). Perhaps most importantly, Class Counsel were able to obtain voluminous data from the Bank about Trustmark's processing practices as well as data about the accounts that Trustmark charged overdraft fees. Joint Decl. ¶ 42. Class Counsel and their financial experts were able to review and analyze millions of transactions, allowing them to understand exactly how Trustmark processed transactions and how it charged overdraft fees to its customers' accounts. *Id.* They also were able to understand the scope of the Settlement Class, identify the Settlement Class members, and analyze their damages. *Id.*

This discovery allowed Class Counsel to better understand the merits of this Action, prepared them for the settlement conferences, and allowed them to engage in vigorous, arms-length negotiations under the direction of an experienced and well-respected Magistrate Judge who fully explored the issues in the case and helped the parties reach the proposed Settlement. *Id.*

#### d. Plaintiffs Would Have Faced Significant Obstacles to Obtaining Relief

■ The Court also considers the likelihood and extent of any recovery from the defendants absent settlement. *Ayers v. Thompson,* 358 F.3d 356, 370 (5th Cir.2004). Plaintiffs and Class Counsel faced several significant risks in this litigation, including federal preemption and challenges to their state law claims. *See generally* Trustmark Motion to Dismiss (Dkt. Nos. 29 & 30); *Gutierrez v. Wells Fargo Bank, NA,* 704 F.3d 712 (9th Cir.2012).

Absent this Settlement, this litigation likely would have continued for two or three more years. Given the myriad risks attending these claims, the Settlement is a fair compromise. *See, e.g., Burford v. Cargill, Inc.,* 2012 WL 5472118, *5 (W.D.La. Nov. 8 2012); *Bennett,* 96 F.R.D. at 349–50 (plaintiffs faced a "myriad of factual and legal problems" that led to "great uncertainty as to the fact and amount of damage," which made it "unwise [for plaintiffs] to risk the substantial benefits which the settlement confers ... to the vagaries of a trial"), *aff'd,* 737 F.2d 982 (11th Cir.1984).

#### e. The Benefits Provided by the Settlement Are Fair, Adequate, and Reasonable Compared to the Range of Possible Recovery

■ In determining whether a settlement is fair given the potential range of recovery, the Court is guided by "[t]he fact that a proposed settlement ... only amount[s] to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved." *Parker v. Anderson,* 667 F.2d 1204, 1210 n. 6 (5th Cir.1982) (quoting *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 455 (2d Cir.1974)). Indeed, "a satisfactory settlement ... could ... amount to a hundredth or even a thousandth part of a single percent of the potential recovery." *Id.* (quoting *City of Detroit,* 495 F.2d at 455 n. 2). This is because a settlement must be evaluated "taking into account the uncertainty and risks involved in litigation" and "in light of the strength of the claims and possible defenses." *Collins v. Sanderson Farms, Inc.,* 568

F.Supp.2d 714, 727 (E.D.La.2008). Thus, courts regularly find settlements to be fair where "[p]laintiffs have not received the optimal relief." *Warren v. City of Tampa,* 693 F.Supp. 1051, 1059 (M.D.Fla.1988).

■ The Settlement provides fair and reasonable benefits to the Settlement Class. Joint Decl. ¶¶ 45–46. Under the Settlement, Plaintiffs and the Settlement Class have recovered $4,000,000 in cash, which represents approximately forty-six and a half percent (46.5%) of the most probable aggregate damages that Class Counsel believe Plaintiffs and the Settlement Class could have recovered at trial. *Id.* Trustmark's agreement to continue its current relatively consumer friendly overdraft policies for a period of two years and pay all fees, costs, and expenses of the Notice Administrator and Settlement Administrator, estimated to be approximately $239,000, further enhance the Settlement. *See* Declaration of J. Bradley Pigott ¶ 20 ("Pigott Decl.") (lauding the $4 million common fund and the "substantial additional future benefits" of the practice changes) (Dkt. No. 45). This recovery is very reasonable given the extraordinary obstacles that Plaintiffs and the Settlement Class faced in the litigation.

**f. The Opinions of Class Counsel, the Class Representatives, and Absent Class Members Favor Approval of the Settlement**

■ "The Fifth Circuit has repeatedly stated that the opinion of class counsel should be accorded great weight" when "evaluating a proposed settlement." *Klein v. O'Neal, Inc.,* 705 F.Supp.2d 632, 649 (N.D.Tex.2010) (citing *Pettway v. Am. Cast Iron Pipe Co.,* 576 F.2d 1157, 1216 (5th Cir. 1978)).

■ Class Counsel believe that this Settlement is deserving of Final Approval, and the Court agrees. Joint Decl. ¶ 52. Indeed, the Court notes that *only 0.01 percent* of Settlement Class Members timely requested to be excluded from the Settlement, and zero Settlement Class Members timely objected to the Settlement. Declaration of Ryan McNamee ¶ 3 (Dkt. No. 49); *also In re Oil Spill by Oil Rig Deepwater Horizon,* 295 F.R.D. at 150 ("one indication of the fairness

of a settlement is the lack of or small number of objections"); *Quintanilla v. A & R Demolition Inc.,* 2008 WL 9410399, *5 (S.D.Tex. May 7, 2008) ("If only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement").

**3. The Settlement Class**

■ This Court has previously found the requirements of Rule 23(a) and 23(b)(3) satisfied in this Action in a settlement posture. *See* Dkt. No. 36. The Court hereby reiterates its findings that: (a) the Settlement Class Members are so numerous that joinder of them is impracticable; (b) there are questions of law and fact common to the Settlement Class that predominate over any individual questions; (c) the claims of the representative Plaintiffs are typical of the claims of the Settlement Class; (d) the representative Plaintiffs and Class Counsel fairly and adequately represent and protect the interests of the Settlement Class Members; and (e) a class action is superior to other available methods for the fair and efficient adjudication of the present controversy.

The individuals listed in Exhibit A to the Final Judgment being entered contemporaneously herewith timely elected to opt out of the Settlement. The Court therefore finds and decrees that they are not part of the Settlement Class, are not bound by the Settlement or release contained therein, and will not receive any distribution from the Settlement Fund.

**4. The Application for Service Awards to the Class Representatives Is Approved**

■ Service awards "compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation." *Altier v. Worley Catastrophe Response, LLC,* 2012 WL 161824, *15 (E.D.La. Jan. 18, 2012) (quoting *Sullivan v. DB Inv., Inc.,* 667 F.3d 273, 333 n. 65 (3d Cir.2011)). "It is not unusual for a court to make an 'incentive award' to named plaintiffs because of their sacrifices in pursuit of litigation on behalf of

the class." *Cook v. Howard,* 2013 WL 943664, *3 n. 4 (S.D.Miss. Mar. 11, 2013) (quoting *In re Catfish Antitrust Litig.,* 939 F.Supp. 493, 503–04 (N.D.Miss.1996)). Courts have consistently found service awards to be an efficient and productive way to encourage members of a class to become class representatives. *See, e.g., McClain v. Lufkin Indus., Inc.,* 2010 WL 455351, *24 (E.D.Tex. Jan. 15, 2010) (granting "named Plaintiffs, Class Representatives, and Class Members ... individual Participation Awards" amounting to a "total of $134,000" divided among "twenty-two individuals"); *In re Catfish Antitrust Litig.,* 939 F.Supp. at 504 ("approving incentive awards of $10,000 to each of the four named plaintiffs"); *Shaw v. Toshiba Am. Info. Sys., Inc.,* 91 F.Supp.2d 942, 973 (E.D.Tex.2000) ("approving incentive awards of $25,000 to each of two named plaintiffs"). The relevant factors include:

> 1) the risk to the class representative in commencing suit, both financial and otherwise; 2) the notoriety and personal difficulties encountered by the class representative; 3) the amount of time and effort spent by the class representative; 4) the duration of the litigation; and 5) the personal benefit (or lack thereof) enjoyed by the class representative as a result of the litigation.

*Humphrey v. United Way of Tex. Gulf Coast,* 802 F.Supp.2d 847, 869 (S.D.Tex.2011).

 The seven (7) named Plaintiffs provided invaluable assistance to counsel in this litigation by, among other things, submitting to interviews, locating and forwarding responsive documents, and participating in conferences with Class Counsel. In so doing, Plaintiffs were integral to forming the theory of the case. Joint Decl. ¶ 56. The service awards represent less than one percent of the Settlement Fund, and the amount of the Service Awards are fair and reasonable in view of the efforts of the named Plaintiffs that have greatly benefited the Settlement Class.

The Court finds that the named Plaintiffs/class representatives expended substantial time and effort in representing the Settlement Class, and deserve to be compensated for such time and effort on behalf of the Settlement Class. Joint Decl. ¶ 56. Therefore, the Court approves the requested service awards of $5,000 for each the seven (7) named Plaintiffs/class representatives, to be paid from the Settlement Fund.

### 5. Class Counsel's Application for Attorneys' Fees Is Granted

Class Counsel request a fee equal to one-third (33.33%) of the $4,000,000 Settlement Fund created through their efforts in litigating this case and reaching the Settlement. The Court analyzes this fee request under *Johnson v. Ga. Hwy. Express, Inc.,* 488 F.2d 714, 717–19 (5th Cir.1974). As set forth below, after considering the *Johnson* factors, the Court concludes that Class Counsel's application for fees in the amount of $1,333,333, equal to one-third (33.33%) of the $4,000,000 Settlement Fund, will be granted.

#### a. The Law Awards Class Counsel Fees from the Common Fund Created Through Their Efforts

 It is well established that when a representative party has conferred a substantial benefit upon a class, counsel is entitled to attorneys' fees based upon the benefit obtained. *Boeing Co. v. Van Gemert,* 444 U.S. 472, 478, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980); *Camden I Condo. Ass'n, Inc. v. Dunkle,* 946 F.2d 768, 771 (11th Cir.1991). The common benefit doctrine is an exception to the general rule that each party must bear its own litigation costs. The doctrine serves the "twin goals of removing a potential financial obstacle to a plaintiff's pursuit of a claim on behalf of a class and of equitably distributing the fees and costs of successful litigation among all who gained from the named plaintiff's efforts." *In re Gould Sec. Litig.,* 727 F.Supp. 1201, 1202 (N.D.Ill.1989) (citation omitted). The common benefit doctrine stems from the premise that those who receive the benefit of a lawsuit without contributing to its costs are "unjustly enriched" at the expense of the successful litigant. *Van Gemert,* 444 U.S. at 478, 100 S.Ct. 745. As a result, the Supreme Court and the Fifth Circuit have recognized that "[a] litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's

fee from the fund as a whole." *Barton v. Drummond Co.*, 636 F.2d 978, 982 (5th Cir. 1981) (citing *Van Gemert*, 444 U.S. at 478, 100 S.Ct. 745); *see also Camden I*, 946 F.2d at 771 ("Attorneys in a class action in which a common fund is created are entitled to compensation for their services from the common fund, but the amount is subject to court approval.").

■ In *Dell*, the Fifth Circuit "endorse[d] the district courts' ... use of the percentage method" when calculating attorneys' fees in common fund class action cases. 669 F.3d at 644. When using the "percentage method ... the court awards fees as a reasonable percentage of the common fund." *Id.* at 642. "[D]istrict courts in [the Fifth] Circuit regularly use the percentage method," which "allows for easy computation" and "aligns the interests of class counsel with those of the class members." *Id.* at 643; *see also Bethea v. Sprint Commc'ns Co.*, 2013 WL 228094, *3 (S.D.Miss. Jan. 18, 2013) ("adopt[ing] the percentage-of-the-fund approach" to calculate attorneys' fees in a common fund class action case).

■ This Court has substantial discretion in determining the appropriate fee percentage. "No general rule can be articulated on what is a reasonable percentage of a common fund." *Bethea*, 2013 WL 228094, *3 (quoting *Smith v. Tower Loan of Miss., Inc.*, 216 F.R.D. 338, 369 (S.D.Miss.2003)). Nonetheless, awards commonly fall between a lower end of 20% and an upper end of 50%. *Smith*, 216 F.R.D. at 368. Further, as aforementioned, "it is not unusual for district courts in the Fifth Circuit to award percentages of approximately one third." *Collins*, 568 F.Supp.2d at 729.

■ Based on the findings below, this Court finds that Class Counsel are entitled to an award of one third (33.33%) of the $4,000,000 Settlement Fund secured through their efforts. Class Counsel achieved an excellent result and overcame numerous procedural and substantive hurdles to obtain this Settlement benefiting the Settlement Class. *E.g.*, Pigott Decl. ¶¶ 11–41.

Class Counsel undertook a risky case against a well-funded foe on multiple fronts and, through diligence, perseverance, and skill, obtained a satisfactory result. They should be compensated in accord with their request, which is both warranted and reasonable given similar fee awards. The Court believes that adequate compensation is necessary to insure that counsel of this caliber is available to undertake these kinds of cases in the future. *See Muehler v. Land O'Lakes, Inc.*, 617 F.Supp. 1370, 1375–76 (D.Minn. 1985).

#### b. As Applied Here, the *Johnson* Factors Demonstrate that the Requested Fee Is Reasonable and Justified

■ The Fifth Circuit's factors for determining a reasonable percentage to award class action counsel are:

(1) the time and labor required;

(2) the novelty and difficulty of the relevant questions;

(3) the skill required to properly carry out the legal services;

(4) the preclusion of other employment by the attorney as a result of his acceptance of the case;

(5) the customary fee;

(6) whether the fee is fixed or contingent;

(7) time limitations imposed by the clients or the circumstances;

(8) the results obtained, including the amount recovered for the clients;

(9) the experience, reputation, and ability of the attorneys;

(10) the "undesirability" of the case;

(11) the nature and the length of the professional relationship with the clients; and

(12) fee awards in similar cases.

#### i. The Claims Against Trustmark Required Substantial Time and Labor

■ Prosecuting and settling these claims demanded considerable time and labor. Class Counsel spent a substantial amount of time investigating the claims of many potential plaintiffs against Trustmark. Joint Decl., ¶ 61. Class Counsel interviewed

numerous Trustmark customers and potential plaintiffs to gather information about Trustmark's conduct, both at the time the lawsuit was filed and in the past, to determine the effect that Trustmark's conduct had on its customers. *Id.* This information was essential to Class Counsel's ability to understand the nature of Trustmark's conduct, the language of the Account agreements at issue, and potential remedies. *Id.* Class Counsel also expended significant resources researching and developing the legal claims at issue. For example, state-by-state legal surveys were necessary to determine which state common law doctrines provided Plaintiffs with viable claims. *Id.* at ¶ 62.

Class Counsel served written discovery requests on Trustmark seeking relevant and probative documents and information. Joint Decl. ¶ 63. The process of developing, refining, and finalizing such discovery requests—with an eye toward class certification, summary judgment, and trial—required considerable effort on the part of Class Counsel. *Id.* Trustmark asserted objections to discovery requests as to many categories of relevant documents. *Id.* at ¶ 64. The parties exchanged voluminous correspondence regarding discovery-related issues and held conferences to resolve the discovery issues between them. *Id.*

Class Counsel also devoted extensive time and effort to researching and preparing various motions and responses, including a motion for class certification and opposition to Trustmark's motions to dismiss and for summary judgment. *Id.* at ¶ 65.

Settlement negotiations and working with experts to refine damage numbers consumed additional time and resources. *Id.* at ¶ 66. The multiple settlement conferences which ultimately led to the Agreement required substantial preparation and follow-up work. *Id.* Moreover, after the Agreement was reached, several weeks of detailed discussions followed concerning the specific terms of the Settlement. *Id.* Once all discussions and drafting was completed, the Agreement was executed in August 2013. *Id.*

Each of the above-described efforts was essential to achieving the Settlement before the Court. Joint Decl. ¶ 67. The time and resources Class Counsel devoted to prosecuting and settling this Action justify the fee that is being requested. Pigott Decl. ¶¶ 21–27 ("[t]he number of hours Class Counsel were required to devote to this litigation, prior to and during the pendency of the two proceedings, was significant").

### ii. The Issues Involved Were Novel and Difficult and Required the Skill of Highly Talented Attorneys

The attorneys on both sides of this case displayed a high level of skill. Joint Decl. ¶¶ 69–71; *see Walco*, 975 F.Supp. at 1472 (explaining that "[g]iven the quality of defense counsel from prominent national law firms, the Court is not confident that attorneys of lesser aptitude could have achieved similar results"); *see also Billitteri v. Secs. Am., Inc.*, 2011 WL 3585983, *7 (N.D.Tex. Aug. 4, 2011) ("[B]ecause of the extremely effective work of opposing counsel ... The skill required here ... certainly justifies the contemplated award").

■ Litigation of this Action required counsel trained in class-action law and procedure as well as the specialized issues presented here. Class Counsel possess these attributes, and their participation added immense value to the representation of this large Settlement Class. Joint Decl. ¶ 70; *also* Pigott Decl. ¶ 11 (Trustmark's practices are "not only beyond the typical capacity of bank customers to detect from their bank statements, but [are] also beyond the capacity of most able attorneys to detect ..."), ¶ 16 (noting Class Counsel possessed "a very unusual professional mastery, [ ] a skill level with which most seasoned attorneys are not in my experience necessarily blessed ...").

### iii. The Claims Entailed Considerable Risk

■ The risks facing the Plaintiffs in this case have been discussed above, in the Motion, and elsewhere. Joint Decl. ¶¶ 73–77. There were myriad ways in which Plaintiffs could have lost this case—yet they achieved a successful Settlement, due largely to Class Counsel. Pigott Decl. ¶¶ 11–14.

 "[C]ounsel should be rewarded for taking on a case from which other law firms shrunk. Such aversion could be due to any number of things, including social opprobrium surrounding the parties, thorny factual circumstances, or the possible financial outcome of a case. All of this and more is enveloped by the term 'undesirable.'" *In re Sunbeam Sec. Litig.*, 176 F.Supp.2d 1323, 1336 (S.D.Fla.2001). In addition, "[t]he point at which plaintiffs settle with defendants ... is simply not relevant to determining the risks incurred by their counsel in agreeing to represent them." *Skelton v. Gen'l Motors Corp.*, 860 F.2d 250, 258 (7th Cir.1988), *cert. denied*, 493 U.S. 810, 110 S.Ct. 53, 107 L.Ed.2d 22 (1989). "Undesirability" and relevant risks must be evaluated from the standpoint of plaintiffs' counsel as of the time they commenced the suit—not retroactively, with the benefit of hindsight. *Lindy Bros. Builders, Inc. v. Am. Radiator & Standard Sanitary Corp.*, 540 F.2d 102, 112 (3d Cir. 1976); *Walco*, 975 F.Supp. at 1473.

Class Counsel faced federal-preemption and state-law defenses, a multistate class certification, as well as the language in Trustmark's account agreements. Joint Decl. ¶ 77; Pigott Decl. ¶¶ 11–14. The Court expresses no opinion on the merits of these arguments; however, the critical point for present purposes is that, heading into this case, Class Counsel confronted these issues without any assurances as to how the Court would rule. Class Counsel accepted the case and the risks that accompanied it. Given the positive societal benefits to be gained from attorneys' willingness to undertake this kind of difficult and risky, yet important, work, such decisions must be properly incentivized. The Court believes, and holds, that the proper incentive here is a one third (33.33%) fee based on the $4,000,000 Settlement Fund.

iv. **Class Counsel Assumed Considerable Risk to Pursue this Action on a Pure Contingency Basis and Were Precluded from Other Employment as a Result**

 Class Counsel prosecuted the Action entirely on a contingent fee basis. Joint Decl. ¶ 78. In undertaking to prosecute this complex class action on that basis, Class Counsel assumed a significant risk of nonpayment or underpayment. Pigott Decl. ¶ 33; Joint Decl. ¶ 78.

In "[r]ecognizing the contingent risk of nonpayment in [class action] cases, courts have found that class counsel ought to be compensated ... for risk of loss or nonpayment assumed by carrying through with the case." *Turner v. Murphy Oil USA, Inc.*, 472 F.Supp.2d 830, 859–60 (E.D.La.2007) (citing *In re Combustion, Inc.*, 968 F.Supp. 1116, 1132 (W.D.La.1997)); *see also Billitteri*, 2011 WL 3585983, at *7 (finding the contingency fee arrangement of a class action "particularly relevant" to the *Johnson* analysis "considering the difficulty presented by the facts and legal questions in [such] case[s] and the very real risk of obtaining no recovery at all"); *King v. United SA Fed. Credit Union*, 744 F.Supp.2d 607, 618 (W.D.Tex.2010) (finding the fact that "[c]lass counsel undertook [the] case on a contingency fee basis" relevant to the *Johnson* analysis).

 Public policy concerns—in particular, ensuring the continued availability of experienced and capable counsel to represent classes of injured plaintiffs holding small individual claims—support the requested fee. Joint Decl. ¶ 79; Pigott Decl. ¶¶ 39–41.

> Generally, the contingency retainment must be promoted to assure representation when a person could not otherwise afford the services of a lawyer.... A contingency fee arrangement often justifies an increase in the award of attorney's fees. This rule helps assure that the contingency fee arrangement endures. If this "bonus" methodology did not exist, very few lawyers could take on the representation of a class client given the investment of substantial time, effort, and money, especially in light of the risks of recovering nothing.

*Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 546 (S.D.Fla.1988), *aff'd*, 899 F.2d 21 (11th Cir.1990).

The risks taken by Class Counsel have already been discussed. It is uncontroverted that the attorney time spent on the Action was time that could not be spent on other matters. Joint Decl. ¶ 83. Consequently,

this factor supports the requested fee. Pigott Decl. ¶ 34.

### v. Class Counsel Achieved an Excellent Result

The Court finds that this Settlement is meaningful. *See* Pigott Decl. ¶¶ 40, 43. The common fund created by this Settlement is $4,000,000. Rather than facing more years of costly and uncertain litigation, the overwhelming majority of Settlement Class Members will receive an immediate cash benefit. Joint Decl. ¶ 72. The Settlement Fund will not be reduced by the $239,000 costs of Notice or Settlement administration; such expenses have been and will continue to be borne separately by Trustmark. *Id.* Moreover, most of the payments to the Settlement Class will be forthcoming automatically, through direct deposit (for Current Account Holders) or checks (for Past Account Holders). *Id.* Finally, as part of the Settlement, Trustmark agreed to continue posting Debit Card Transactions in a chronological order. *Id.*

### vi. The Requested Fee Comports with Fees Awarded in Similar Cases

The fee sought here matches the fee typically awarded in similar cases. Pigott Decl. ¶¶ 38, 43; Joint Decl. ¶ 82. Indeed, numerous decisions have found that a one-third recovery is well within the range of a customary fee. *See, e.g., Shaw,* 91 F.Supp.2d at 972 ("Empirical studies show that . . . fee awards in class actions average around one-third of the recovery"); *In re Shell Oil Refinery,* 155 F.R.D. 552 (E.D.La.1993) (awarding "1/3 in fees from a settlement fund of $170,000,000") (cited in *In re Combustion,* 968 F.Supp. at 1139); *In re Combustion,* 968 F.Supp. at 1136, 1142 (awarding 36% on a settlement fund of $127,396,000); *Teichler v. DSC Commc'ns Corp.,* CA 3–85–2005–T (N.D.Tex. Oct. 22, 1990) ("plaintiffs' counsel awarded $10 million on a settlement of $30 million in securities class action") (cited in *In re Catfish Antitrust Litig.,* 939 F.Supp. at 500); *Kleinman v. Harris,* Civil Action No. 3:89–CV–1869–X (N.D. Tex. June 21, 1993) ("approving fee of approximately one-third of benefit achieved of $1,170,000") (cited in *In re Catfish Antitrust Litig.,* 939 F.Supp. at

500); *Faircloth v. Certified Fin. Inc.,* 2001 WL 527489, *9 (E.D.La. May 16, 2001) (awarding 33.34% on a $1,534,321 settlement fund); *In re Vioxx,* 2013 WL 5295707, at *4–5 (awarding 33%); *Barrera v. Nat'l Crane Corp.,* 2012 WL 242828, at *5 (W.D.Tex.2012) (awarding one-third); *Finkel v. Docutel/Olivetta Corp.,* CA3–84–0566–T (N.D.Tex. Feb. 23, 1990) ("awarding fees amounting to 33% of settlement fund") (cited in *In re Catfish Antitrust Litig.,* 939 F.Supp. at 500); *In re Lomas Fin. Corp. Sec. Litig.,* No. CA–3–89–1962–G (N.D.Tex. Jan. 28, 1992) ("approving fee of almost one-third of benefit") (cited in *In re Combustion,* 968 F.Supp. at 1139).

The Court finds that a fee of one-third (33.33%) of the $4,000,000 Settlement Fund, plus expenses, is appropriate here and comports with customary fee awards in similar cases. Pigott Decl. ¶ 38.

### vii. The Remaining *Johnson* Factors also Favor Approving the Requested Fee

The Court finds that the remaining *Johnson* factors further support Class Counsel's fee request, and so holds. Pigott Decl. ¶¶ 28–35. This fee is firmly rooted in "the economics involved in prosecuting a class action." *In re Sunbeam,* 176 F.Supp.2d at 1333. The Court is convinced that proper incentives must be maintained to insure that attorneys of this caliber are available to take on cases of significant public importance like this one. The factual record in this case compels the result required by this Order. Pigott Decl. ¶¶ 42–44.

### 6. Class Counsel's Application for Reimbursement of Litigation Costs and Expenses Is Approved.

Finally, the Court finds that Class Counsel's reimbursement request for a total of $181,213.18 in litigation expenses is reasonable and justified. These costs and expenses consist of: (1) $168,600.00 in fees and expenses for experts; (2) $9,738.35 in travel costs; and (3) $2,874.83 in administrative expenses (i.e., filing and court fees, PACER charges, copies, postage, delivery fees, and similar expenses). These costs and expenses, advanced by Class Counsel

for the benefit of the Settlement Class, were necessarily incurred in furtherance of the prosecution of this Action. Joint Decl. ¶ 84. Accordingly, reimbursement of costs and expenses in the amount of $181,213.18 shall be made from the Settlement Fund following disbursement of attorneys' fees.

### 7. Trustmark Has Complied with the Notice Provisions of 28 U.S.C. § 1715

On October 2, 2013 and December 18, 2013, Trustmark served notices upon (a) the Director of Litigation for the Office of the Comptroller of the Currency ("OCC") and (b) the OCC office with supervisory authority over Trustmark, which provided all information required by 28 U.S.C. § 1715 to the appropriate public/government officials. *See* OCC Bulletin 2006–20. Both of these notices were served more than 90 days prior to March 25, 2014 Final Approval Hearing and entry of this Order. No objections or request to be heard has been filed in response to these notices. Accordingly, Trustmark has fully complied with all settlement notification requirements of 28 U.S.C. § 1715.

### *CONCLUSION*

This Order takes notice of and incorporates by reference all documents and record evidence presented in this matter, including, but not limited to: the Settlement Agreement [33–1], the Order Preliminarily Approving Class Settlement and Certifying Settlement Class [36], the Declarations in Support of the Motion for Final Settlement Approval [43, 44, 45, 46], the Declaration of Ryan McNamee [48, 49], the Notice of Lack of Objections [50], the Joint Stipulation [51], the Supplemental Joint Declaration [52], Trustmark's Notice of Proposed Class Action Settlement [53], and Trustmark's Supplemental Notice of Proposed Class Action Settlement [54].

For the foregoing reasons, the Court: (1) grants Final Approval to the Settlement; (2) certifies for settlement purposes the Settlement Class pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(3), and 23(e); (3) appoints as Class Representatives the seven (7) Plaintiffs identified in paragraphs 31 and 56 of the Agreement; (4) appoints as Class Counsel the law firms and attorneys listed in paragraph 30 of the Agreement; (5) approves Service Awards for each of the seven (7) named Plaintiffs in the amount of $5,000 each; (6) awards Class Counsel attorneys' fees in the amount of $1,333,333.00, equal to 33.33% of the $4,000,000 Settlement Fund, plus reimbursement of litigation costs and expenses in the amount of $181,213.18[5]; (7) directs Class Counsel, Plaintiffs, and Trustmark to implement and consummate the Settlement pursuant to its terms and conditions; (8) retains continuing jurisdiction over Plaintiffs, the Settlement Class, and Trustmark to implement, administer, consummate, and enforce the Settlement and this Final Approval Order; and (9) will separately enter Final Judgment dismissing the Action with prejudice.

---

5. This amount includes the $50,000.00 advanced by Trustmark for costs of the settlement allocation analysis, which amount the Settlement Administrator or Escrow Agent is to pay directly to Trustmark.